### In re COUNTRYWIDE FINANCIAL CORP. DERIVATIVE LITIGATION.

**Lead Case No. CV–07–06923– MRP (MANx).**

United States District Court, C.D. California.

May 14, 2008.

ORDER (1) GRANTING IN PART AND DENYING IN PART NOMINAL DEFENDANT COUNTRYWIDE'S MOTION TO DISMISS; (2) GRANTING IN PART AND DENYING IN PART INDIVIDUAL DEFENDANTS' MOTION TO DISMISS; AND (3) GRANTING DEFENDANT DOUGHERTY'S MOTION TO DISMISS.

MARIANA R. PFAELZER, District Judge.

Before the Court are several motions to dismiss Plaintiffs'[1] derivative claims in *In re Countrywide Financial Corp. Derivative Litigation ("Arkansas Teachers")*. Nominal Defendant Countrywide Financial Corporation ("Countrywide" or "Company") moves to dismiss on the grounds that

---

1. The Lead Plaintiffs in *Arkansas Teachers* are Arkansas Teacher Retirement System ("ATRS"), Fire & Police Pension Association of Colorado ("FPPAC"), Public Employees Retirement System of Mississippi ("MS PERS") and Louisiana Municipal Police Employees Retirement System ("LAMPERS"), and Central Laborers Pension Fund (collectively, "Plaintiffs").

Plaintiffs' have not made pre-suit demand or adequately pled that demand is excused in this case.[2] Individual Defendants[3] move to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), 9(b), 8(a)(2), and the provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u–4(b)(1), 78u–4(b)(2), 78u–5(c)(1)(a), § 78u–5(c)(2)(a).

# I.

# BACKGROUND

A complete procedural background of this and other related proceedings is provided in the Court's March 28, 2008 Order. Relevant here, Plaintiffs filed a Consolidated Complaint on February 15, 2008 alleging both derivative and class action claims. *See* Consolidated Shareholder Derivative Action and Class Action Complaint for Breaches of Fiduciary Duty, Aiding and Abetting Breaches of Fiduciary Duty, and Violations of the California and Federal Securities Laws ("Compl."). On March 28, this Court stayed the class action claims in favor of similar proceedings in the Delaware Court of Chancery. The instant motions seek to dismiss the nine remaining derivative claims.

## A. Plaintiffs

Plaintiffs here are Arkansas Teacher Retirement System ("ATRS"), Fire & Police Pension Association of Colorado ("FPPAC"), Public Employees Retirement System of Mississippi ("MS PERS"), and Central Laborers Pension Fund ("CLPF").

## B. Nominal Defendant

Nominal Defendant Countrywide is a Delaware corporation with its principal ex-

ecutive offices in Calabasas, California. *Id.* ¶ 53.

## C. Individual Defendants

The Individual Defendants consist of both director and non-director defendants. The Complaint names as director Defendants, Angelo R. Mozilo (Chairman of the Board since 1999 and Chief Executive Officer since 1998), David Sambol (Director since Sept. 2007, President and Chief Operating Officer, and various other executive positions), Jeffrey M Cunningham (Director since 1998), Robert J. Donato (Director since 1993), Martin R. Melone (Director since 2003), Robert T. Parry (Director since 2004), Oscar P. Robertson (Director since 2000), Keith P. Russell (Director since 2003), Harley W. Snyder (Director since 1991), Henry G. Cisneros (Director from 2001–Oct.2007), and Michael E. Dougherty (Director from 1998–Jun. 2007). *Id.* ¶¶ 54–64.

The Complaint names as non-director Defendants Stanford M. Kurland (President and Chief Operating Officer until 2006, and various other executive positions), Carlos M. Garcia (several executive positions and former Chief Financial Officer), and Eric P. Sieracki (Chief Financial Officer and Executive Managing Director). *Id.* ¶¶ 66–69.

## D. Countrywide's Business

Countrywide originates home loans, retaining a portion of these loans on its balance sheet as investments, and securitizing and selling the remainder. *Id.* ¶ 101. The Company services the loans that it produces. *Id.* ¶ 102. It produces

---

2. Countrywide also argues that Plaintiffs have not demonstrated standing with specificity—i.e. stock ownership at al material times alleged in the Complaint. The Court finds that Plaintiffs allegations of standing in their complaint, coupled with verifications

from Plaintiffs' attorneys, *see* Pls.' Notice of Filing Verifications, suffices to meet the standing requirement.

3. Individual Defendant Michael Dougherty has filed a separate motion to dismiss.

both "conforming loans" which can be sold to government-sponsored entities Fannie Mae and Freddie Mac, and non-conforming ones, which can be sold only to private investors. *Id.* ¶¶ 106–108. Countrywide finances its operations in large part with capital from private parties—including the secondary mortgage market, where investors purchase mortgages and "mortgage-backed securities." *Id.* ¶¶ 103–104. In addition to retaining some in its portfolio for investment purposes, the Company holds "retained interests"—or residual interests in some mortgage-backed securities that have been passed along to investors. *Id.* ¶ 208. According to the Complaint, retained interest holders receive interest payments from a "real estate mortgage investment conduit" only after all required regular interest has been paid to investors in higher priority securities tranches. *Id.* ¶ 129. Finally, the Company maintains a catalog of "loans held for sale" composed of mortgages that will ultimately be sold to third party investors, and "mortgage servicing rights"[4] on the mortgages that it originates. *Id.* ¶ 210.

Countrywide must consistently produce quality mortgages, or at least mortgages "at levels that meet or exceed secondary mortgage market standards" to ensure that the secondary market will continue to provide capital to finance its operations. *Id.* ¶¶ 104–105. Moreover, if the Company originates and sells loans that are not in compliance with its own underwriting policies, in violation of the representations or warranties made to purchasers, those purchasers can require Countrywide to repurchase them. *Id.* ¶ 106.

### E. Plaintiffs' Allegations

### 1. Increased Origination of Non-conforming Loans

Plaintiffs allege that from 2002–2006, the Company steadily increased the origination of "non-conforming" loans, which are inherently less safe than conforming loans because they cannot be sold to government-sponsored entities. *Id.* ¶¶ 106–108. Countrywide also "strategically" shifted away from traditional fixed-rate home loans to borrowers with "prime" credit scores, in favor of a variety of non-traditional higher-risk loans. *Id.* ¶ 109. The Complaint identifies several categories of these non-traditional loans: (1) adjustable rate mortgages (ARMs), which typically provided a low "teaser" interest rate during an introductory period, followed by higher rates; (2) interest-only mortgages, where require the borrower to pay only the interest during an introductory period; (3) "pay option" ARMs, which provide the borrower the option to pay a "minimum" monthly payment less than the interest accruing that month, and add any remaining interest to loan principal; (4) stated income loans, which rely on the borrower's representations of an ability to pay, and require little or no supporting documentation from the borrower; and (5) home equity lines of credit ("HELOCs"), which are second loans secured by the difference between the value of a home and the amount due on the first mortgage.[5] *Id.* ¶ 110.

Plaintiffs allege that these types of loans are considerably more risky than tradition-

---

4. "MSRs arise from contractual agreements between the Company and investors ... in mortgage securities or loans" whereby "the Company performs loan servicing function in exchange for fees and other remuneration." Compl. ¶ 210 n. 7.

5. Though the Complaint identifies stated-income loans as a separate category of loans, each of the other categories of loans, such as pay option ARMs and HELOCs, may also be offered on a low- or no-documentation basis, without requiring full verification of the borrower's ability to pay. This is discussed further in the next section.

al conforming loans. *Id.* ¶ 119. For instance, with stated income loans, the borrower may overstate his income, resulting in a loan that is fundamentally at risk of default if the borrower's income is inadequate. *Id.* ¶ 110. In addition, HELOCs become a problem if housing prices decline: the HELOC lender's security interest decreases because the first lien-holder has priority to be paid in full the amount of the first mortgage. At the extreme, the HELOC becomes completely unsecured. *Id.* Plaintiffs contend that this can occur with a mere 10–20% reduction in the value of a home. *Id.*

Pay option ARMs raise other concerns. With pay option ARMs, a borrower's failure to pay at least the minimum monthly interest results in "negative amortization," whereby any interest that remains unpaid is added to the amount of principal outstanding on the loan. *Id.* ¶ 121. While accumulated negative amortization is reported as deferred interest earnings on the Company's income statement or with the loan on the balance sheet, it is particularly problematic where borrowers chose to skip payments out of necessity, as those borrowers very likely have an increased risk of default. *Id.* ¶ 122.

### 2. Origination of Loans in Violation of the Company's Underwriting Standards

Significantly, according to Plaintiffs, Countrywide did not simply originate loans that were inherently risky. *Id.* ¶ 116. Rather, the Company exacerbated the risky nature of these loans by offering them to borrowers without requiring them to document their income. *Id.* For instance, the vast majority (78% in 2004, and 91% in 2006) of Countrywide's pay option ARMs fell into the "low documentation" category. *Id.* ¶¶ 12, 116–121. Without assurances of the credit-worthiness of its borrowers, Countrywide could not reasonably know how likely it was that deferred

interest on pay option ARMs would ultimately be repaid. *Id.* ¶ 122. According to Plaintiffs, HELOCs, too, were provided to borrowers who were less credit-worthy than that instrument required. While HELOCs were often labeled as "prime" products, one observer in late 2007 commented that Countrywide's HELOCs were performing on par with a competitor's subprime loans. *See id.* ¶¶ 250–251 (citing analyst who observed that Countrywide's "definition of 'prime' was [apparently] loosened in the recent boom").

Plaintiffs allege that in practice, the origination of these "riskier" loans often violated the Company's own loan underwriting policies. The Complaint offers the accounts of numerous confidential witnesses, who are mostly former employees such as underwriters and loan officers, relating how Countrywide departed from its strict underwriting standards by generating large numbers of loans without proper regard for their quality. *See* ¶¶ 147–158 (noting standards were also loosened with respect to loans labeled and marketed as "prime"). The Complaint also provides the accounts of several former vice presidents at Countrywide who similarly attest that Countrywide was simply pushing through loans without adherence to underwriting standards. *Id.* ¶¶ 148–152.

### 3. Failure to Effectively Hedge and Adjust Loan Loss Allowance and Impairment Charges

Despite the changes to Countrywide's loan portfolio that resulted from the combination of increasingly risky loans offered by Countrywide and increasingly lax adherence to loan underwriting standards, Plaintiffs contend that Individual Defendants improperly maintained the Company's "loan loss allowances" for loans held for investment at depressed levels from 2003–2006. *Id.* ¶¶ 16, 194. Loan loss al-

lowances are set aside to absorb the estimated amount of probable losses in the loan portfolio. *Id.* ¶ 194. Viewed as a percentage of the overall loan portfolio, Plaintiffs observe, the allowances in 2003–2006 were less than half their 2002 levels. *Id.* (noting reserves of 0.69% in 2002, but an average reserve of just over 0.30% in the following four years). By maintaining such low reserves, Plaintiffs allege, Defendants improperly boosted profits and deceived the market as to the true risk of their portfolio. They point to the sudden rise in loan loss allowances from 0.33% in 2006 to 1.84% by the end of 2007 as evidence that the allowances for this whole period had been inadequate.

Similarly, it is alleged that proper Board oversight would have led to increased impairment charges on residual interests held by the Company with respect to pay option ARMs that were securitized. *Id.* ¶ 204.

Plaintiffs also contend that the Company's "hedges" for retained interests [6] and Mortgage Servicing Rights ("MSRs")—devices which serve to mitigate negative valuation changes in these various interests—were ineffective. *Id.* ¶¶ 210–212. They also contend that the valuations of these interests were based upon improper assumptions, which caused them "to fluctuate wildly without any basis." *Id.* ¶ 230. Plaintiffs also provide the testimony of a Vice President-level confidential witness who reports that the hedge he worked on

failed to meet the requirements of "FAS 133," a standard metric for hedging activities, and furthermore, that he was asked by Countrywide management to improperly remove bad loans retroactively from the portfolio. *Id.* ¶¶ 221–229.

## F. Duties of Individual Defendants on Board Committees [7]

The Board's Committees were tasked with the duties to actively monitor and control all of these aspects of the Company's business. [8] *Id.* ¶ 26. The Audit and Ethics Committee was obliged to oversee the integrity of financial statements and reports and discuss, manage, and monitor the Company's exposure to risk. *Id.* ¶¶ 79–81. The Credit Committee was responsible for overseeing credit objectives and policies, including review of the Company's credit exposures and loan loss allowances. *Id.* ¶¶ 86–87. The Finance Committee was required to assess the Company's access to liquidity, both long and short term, and review "equity repurchases." *Id.* ¶¶ 92, 29. The Compensation Committee was responsible for the overall compensation structure for employees, and executive compensation. *Id.* ¶¶ 29, 82–85. Lastly, the Operations and Public Policy Committee was charged with oversight of "operational risk" and other matters relating to responsible lending. *Id.* ¶ 95. The Complaint sets forth the membership of director Defendants on

---

**6.** According to Plaintiffs, Countrywide typically retained interests in non-prime mortgages and prime HELOCs and ensured that the retained interests would take the first losses from defaults. *Id.* ¶ 129. By taking the first losses from defaults, Countrywide enhanced the credit rating of its securitized mortgages by providing investors with a limited degree of default protection. *Id.* ¶¶ 127–129.

**7.** Eleven of the Individual Defendants are, or were, on the Board of Directors: Mozilo, Sambol, Cisneros, Cunningham, Donato,

Dougherty, Melone, Parry, Robertson, Russell, and Snyder. Mozilo and Sambol, as company executives, were not on any Committee. Defendants Kurland, Garcia, and Sieracki were not on the Board; however, like Mozilo and Sambol, they were Countrywide executives during the Relevant Period.

**8.** The only Committee that Plaintiffs do not allege were charged with oversight of Company operations is the Corporate Governance & Nominating Committee. *See* Compl. ¶ 77.

these committees as well as the frequency of committee meetings. *See, e.g., id.* ¶ 77.

Plaintiffs also cite other examples indicating that Individual Defendants were aware of their duties to monitor the Company's practices, including (1) public statements made in 2007 that the Board "has always been actively engaged" in overseeing business strategy; and (2) signatures by director Defendants and Defendant Sieracki on the Company's Form 10–K filings with the United States Securities and Exchange Commission ("SEC"), *id.* ¶¶ 132–135.

## G. Red Flags

Throughout the Complaint, Plaintiffs identify numerous "red flags" that would have invariably provided warnings to the Individual Defendants, including those on the relevant Board Committees above, to increasingly serious problems with loans generated by the Company: (1) the shift to riskier loan products; (2) the rising delinquencies in pay-option ARMs and HELOCs, *id.* ¶ 198; (3) sharply rising rates of negative amortization and associated "phantom earnings," *id.* ¶¶ 121, 139; (4) the "dramatic increase in retained interests held on Countrywide's balance sheet," *id.* ¶ 130; (5) the fact that the Company's valuation of MSRs, retained interests and loans held for sale "fluctuate[d] wildly without any basis," *id.* ¶ 230; (6) the pitfalls of other mortgage lenders, *id.* ¶ 299; and (7) industry publications about nontraditional loans, including those that were critical of low-documentation pay option ARMs, *id.* ¶ 139.

## H. Defendants' False and Misleading Statements

In view of Countrywide's loan origination practices and failure to monitor, Plaintiffs allege that Individual Defendants caused Countrywide to issue false and misleading statements. These statements reassured investors as to the quality of loans originated by Countrywide and the procedures and policies for underwriting and managing risk. Plaintiffs contend that these statements were misleading because they failed to inform the public about the true nature of the loans originated by the Company and the risk to the Company's long term prospects. Plaintiffs identify several different categories of public statements:

### 1. Press Releases and Conference Calls

Plaintiffs point to allegedly misleading press releases, including releases as early as 1Q04 and 3Q04, in which Mozilo stressed "the strength and flexibility of [Countrywide's] business model and risk management strategies." *Id.* ¶¶ 276–277. Similarly, at the end of 3Q05, Countrywide announced that it was "well-positioned with a ... high quality credit profile in our loan portfolio." *Id.* ¶ 279. Similarly, with its 1 Q06 results, Countrywide touted its "time-tested business model" in this "challenging environment." *Id.* ¶ 278.

Plaintiffs also provide excerpts of conference calls with analysts. For example, in April, 2004, Mozilo stated that "Countrywide has ... very strong discipline in the origination of sub-prime loans" and specifically assured an analyst that "[i]t is well over 720 FICO average on HELOCs" so as to be mostly prime or better. *Id.* ¶¶ 281–282. Similarly, Mozilo in April, 2005 characterized pay option ARMs as a "very good product" that is a "time tested," and in May, 2005 Sambol explained that risks were mitigated in those products by "different underwriting criteria ... such as maybe higher credit scores or lower loan to value ratios." *Id.* ¶¶ 284–285.

### 2. SEC Filings

The Complaint also references filings with the SEC where Countrywide made

similar disclosures. For example, the Form 10–Q for 1Q04 stated that the Company "only retain[ed] high credit quality mortgages in [its] loan portfolio" and the Form 10–K for the 2004 fiscal year stated that the Company "actively manage[d] credit risk" and described in detail underwriting guidelines and loan origination standards. *Id.* ¶¶ 287–289. *See also* ¶ 295 (identifying similar statement that the Company manages credit risk related to pay option ARMs, and describing underwriting requirements). In the Company's Form 10–Q filed on November 8, 2005, it indicated that its "pay-option loan portfolio has a very high initial loan quality, with original average credit rating (expressed in terms of FICO scores) of 720" and that it originated pay-option loans to borrowers who can qualify at the loan's fully-indexed interest rates. *Id.* ¶ 293. *See also* ¶ 293 (citing statement repeated in Form 10–Q filed on May 9, 2006). The director Defendants and Sieracki represented, in the Company's Form 10–K for 2006, that they were "actively monitoring the delinquency and default experience of … homogenous pools by considering current economic and market conditions" and that "the senior management [was] actively involved in the review and approval of our allowance for loan losses." *Id.* ¶ 204.

### 3. Proxy Statements

The Complaint alleges that proxy statements for the annual shareholder's meetings in 2005, 2006, and 2007 were likewise materially false and misleading. The 2005 statement, for example, filed April 29, 2005, sought a vote in favor of re-election of Mozilo, Kurland, Robertson and Russell to the Board as well as approval of an amended Annual Incentive Compensation Plan. *Id.* ¶ 307. It did not, however, disclose that reported figures were boosted by reliance on risky products to inflate short-term performance. *Id.* ¶¶ 307–309. Had shareholders known of these "undisclosed fundamental changes to the Company's business model," Plaintiffs contend, the relevant Defendants would not have been re-elected. *Id.* ¶¶ 308–309. The 2006 and 2007 statements were similarly misleading, and, in addition, contained misleading statements about the effectiveness of Countrywide's compensation policies and financial performance. *Id.* ¶¶ 310–318.

### 4. 2007 Statements About Countrywide's Position

Plaintiffs also allege that Individual Defendants continued to make misleading statements to the public in 2007, at which point the demise of many competing lenders was largely evident. For example, in March 2007 Mozilo stated that Countrywide was "more diversified" than competing subprime lenders, and that only 7% of the Company's originations, and only ".2 percent of [Countrywide's] assets" were in the sub-prime category. *Id* ¶ 299. Mozilo went on to state that subprime issues "will be great for Countrywide at the end of the day because all the irrational competitors will be gone." *Id.* ¶¶ 299–301. On August 23, 2007, Mozilo reassured the market that "there is no more chance for bankruptcy [then] than [there] was six months ago, two years ago, when the stock was $45 per share" and that "Countrywide's future is going to be great." *Id.* ¶ 303.

### I. Insider Selling

Plaintiffs allege that Individual Defendants enriched themselves by selling vast quantities of stock in "illegal, insider sales." *Id.* ¶ 29. Sales in the Relevant Period were made at inflated prices because of the "a whole host of associated false and misleading statements" that deceived investors as to the true financial condition of Countrywide and the nature of the loans that were being originated by Countrywide. *Id.* ¶ 30. In the aggregate,

these sales were substantial: Individual Defendants realized proceeds of about $850 million between 2004 and the end of 2007, with Mozilo selling some $474 million worth of shares. *Id.* ¶ 322. During this period, Plaintiffs place particular emphasis on a $2.4 billion stock repurchase program in which Countrywide repurchased several million shares in 4Q06 and 2Q07. *Id.* ¶¶ 325–326. They argue that it is suspicious that several directors and officers sold some $150 million of their personal shares during these repurchase periods.

The Complaint also alleges that Mozilo frequently revised his "passive" Rule 10b5–1 stock sale plan to sell additional shares each month during the repurchase periods. *Id.* ¶¶ 331–332. It seeks to tie the sales of other directors and officers to those of Mozilo, alleging for example, that other insiders' sales doubled in November 2006 as compared to October 2006, and after Mozilo's February amendment to his 10b5–1 plan, "[insiders] sold more the week of February 2 [2007] through February 9 than they had the previous two months." *Id.* ¶¶ 339–340.

## J. Countrywide's Significant Collapse in Value

The Complaint describes a drastic drop in common stock value, from $45 in February 2007 to less than $5 in January 2008, government investigations into lending practices and accounting, significant liquidity constraints that limit its ability to conduct business, and damage to goodwill and reputation. *Id.* ¶¶ 3, 231. Plaintiffs attribute the collapse in share value primarily to "a number of shocking disclosures" in July 2007 and later when the Company was forced to disclose (1) that it took large

loan loss provisions to offset delinquencies in home equity lines of credit ("HELOCS") and pay-option adjustable rate mortgages ("pay-option ARMs"); and (2) that the fair value of the Company's mortgage servicing rights ("MSRs") and retained interests dropped considerably, and the losses could only be partially offset by the Company's hedging. *Id.* ¶¶ 3–7. The Complaint asserts that these disclosures shocked investors both because of the magnitude of the "miscalculations" and because they reflected previous misrepresentations of the quality of the loans originated by Countrywide. *Id.* ¶ 5.

On July 24, 2007, Countrywide reported second quarter earnings below its estimates, in large part because (1) Countrywide took $417 million of impairment charges on credit-sensitive retained interests (including a $388 million to its retained interest in the securitization of HELOCs); (2) Countrywide took a $293 million loan loss provision on its loans held for investment (including $181 million for HELOCs). *Id.* ¶¶ 241–244. Countrywide's stock dropped 10% on that day to $30.50. *Id.* According to Plaintiffs, the July 24, 2007 disclosure was so surprising because it related principally to the Company's prime loan portfolio. *Id.* ¶ 245.[9]

Plaintiffs allege, however, that until July 2007, Countrywide had misled investors that its HELOCs were prime loans, when in fact the risk associated with HELOCs was on par with other lenders' subprime loans. *Id.* ¶ 245. Following these disclosures, "a steady flow of analyst and news reports ... suggested that Countrywide hid its true default risk of exposure" and changed analysts' beliefs that Countrywide

9. Shortfalls due to Countrywide's subprime operations, by that point, had become somewhat expected due to competitors' subprime woes. *Id.* ¶¶ 245–246. Accordingly, in April 2007, when Countrywide attributed disap-

pointing earnings to a decline of $400 million in subprime operations, the Company's stock actually closed a dollar higher, suggesting that the market was prepared for that announcement. *Id.* ¶ 246.

was poised to "outperform weaker competitors due [to] its limited (and well-managed) credit risk." *Id.* ¶ 245. Analysts explained that "[management] made serious miscalculations (and possibly misrepresentations) about the quality of loans added to the bank," *id.* ¶ 249, and that Countrywide's "home equity securitizations are performing roughly in line with [competitors'] sub-prime deals." *Id.* ¶ 250.

On August 9, 2007, Countrywide filed its quarterly report for 2Q07, confirming the reports from July 24, and also warning that Countrywide was facing liquidity issues. *Id.* ¶ 254. Credit rating agency Moody's downgraded Countrywide on both August 2 and August 16, and on August 15, a Merrill Lynch analyst raised concerns that Countrywide could be forced into bankruptcy. *Id.* ¶¶ 253–254. On August 16, Countrywide "drew down" an $11.5 billion credit from its bank lines. *Id.* ¶ 254. Countrywide's share price dropped over several days from $27.75 to $18.95. Finally, on August 22, 2007, Bank of America purchased $2 billion of preferred stock that pays a 7.25% interest coupon and is convertible at a strike price of $18 per share.

### K. Plaintiffs' Claims

Plaintiffs make nine derivative claims. Claims 1–3 assert that Individual Defendants breached their fiduciary duties, including their duties to act in good faith, loyalty, and with due care and diligence in the management of the Company; and that they committed corporate waste in awarding Mozilo's compensation and instituting the stock repurchase.

Claim 4 alleges insider trading against Mozilo, Kurland, Garcia, Sambol, Robertson, Dougherty, Snyder, Cisneros, Donato, Cunningham, Russell, and Sieracki pursuant to Cal. Corp.Code § 25402. *Id.* ¶¶ 506–511. Claim 5 asserts that the director Defendants aided and abetted the "insider trading" defendants in their breaches of fiduciary duties. *Id.* ¶¶ 512–516. Claims 6–9 allege violations of the federal securities laws, including § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b–5, for "participat[ing] in a scheme with the purpose and effect of defrauding Countrywide ... to purchase at least $2.4 billion in shares ... at an artificially inflated" price. *Id.* ¶¶ 517–528.

## II.

## DISCUSSION

The Court begins with two observations that are relevant to the entire analysis. First, as the parties recognized at oral argument, the standard for stating a claim under Exchange Act § 10(b) and Rule 10b–5 overlaps considerably with the standard implicated in analyzing demand. Under the Private Securities Litigation Reform Act ("PSLRA"), the Court evaluates whether the facts pled give rise to a strong inference of scienter. *See Dura Pharm. v. Broudo,* 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). Similarly, the Court applies a "scienter-based" standard in evaluating the Plaintiffs' claim that demand is excused in this derivative case on a failure of oversight theory. *See Desimone v. Barrows,* 924 A.2d 908, 935 (Del. Ch.2007). Here, the highly repetitive briefing of the motions is an affirmation that the two issues are inextricably linked.

Second, the Court is able to draw no support from the conclusory portions of the prolix and sprawling Complaint, as they cannot satisfy the various statutory and common law requirements at issue. However, in evaluating scienter, the Court notes that its job is "is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. ——, 127 S.Ct. 2499, 2511, 168 L.Ed.2d 179

(2007). Thus, the Court proceeds by evaluating Defendants' Motions to Dismiss for failure to meet the requisite pleading standards under the PSLRA and Fed.R.Civ.P. 12(b)(6), 9(b), and 8(a)(2). It then assesses Countrywide's motion to dismiss for failure to make pre-suit demand.

## A. Exchange Act § 10(b)

Count VI of the complaint pleads a violation of § 10(b) of the Exchange Act. A § 10(b) claim requires the following elements: (1) a material misrepresentation or omission; (2) scienter; (3) reliance; (4) economic loss; and (5) loss causation, which is "a causal connection between the material misrepresentation and the loss." *Dura Pharm. v. Broudo*, 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); 15 U.S.C. § 78u–4(b)(4). Together, the Individual Defendants' and Defendant Dougherty's Motions to Dismiss argue that Plaintiffs have failed to plead each of these elements. The Court addresses each in turn.

### 1. Scienter

In order to survive a motion to dismiss, the Private Securities Litigation Reform Act requires that the complaint plead "with particularity facts giving rise to a strong inference" of scienter, a mental state that embraces the intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); 15 U.S.C. § 78u–4(b)(2). At a minimum, the facts pleaded must provide strong circumstantial evidence of "deliberate recklessness," and must "come closer to demonstrating intent, as opposed to mere motive and opportunity." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir.1999). Moreover, "all of the facts alleged, taken collectively" must give rise to an inference of scienter that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 127 S.Ct. at 2504–05, 2509 (2007).

### a. Analysis

■ Setting aside the conclusory and unsupported portions of the two hundred-page Complaint, Plaintiffs' allegations create a cogent and compelling inference that the Individual Defendants misled the public with regard to the rigor of Countrywide's loan origination process, the quality of its loans, and the Company's financial situation—even as they realized that Countrywide had virtually abandoned its own loan underwriting practices. During the relevant period, Plaintiffs assert that Countrywide began to approve even more risky loans that departed significantly from its established underwriting guidelines. While this increased the volume of loans originated by Countrywide and inflated its market share, this strategy also drastically lowered the quality of the loans and retained interests that Countrywide held for investment, as well as the quality of the mortgage-backed securities it sold into the secondary market. Plaintiffs contend that these low quality mortgages, many of which were approved with low or no documentation from the borrower, exposed Countrywide to a vast amount of undisclosed risk because loan quality is essential to virtually every facet of Countrywide's business operations. Plaintiffs further assert that the Individual Defendants, due to their roles as members of certain Committees, proceeded with actual knowledge of these problems, or at least deliberate recklessness. *See, e.g.,* ¶¶ 13, 142.

Here, the Court finds that Plaintiffs have successfully pleaded facts giving rise to a strong inference of scienter.

### 1. The Confidential Witnesses give rise to a strong inference that significant deviations from underwriting standards were widespread, and not isolated indiscretions by a few low level employees.

██ Confidential witnesses may be probative of scienter where each of their accounts is "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Daou Systems, Inc.*, 411 F.3d 1006, 1015 (9th Cir.2005); *accord Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 711–712 (7th Cir.2008) (Posner, J.), *on remand from Tellabs*, 127 S.Ct. 2499. Corroboration from multiple sources also supports an inference of scienter. *Tellabs*, 513 F.3d at 712.

Here, the witnesses cited in the Complaint, many of whom are labeled "confidential," paint a compelling portrait of a dramatic loosening of underwriting standards in Countrywide branch offices across the United States. Compl. ¶¶ 147–168. The Complaint alleges that underwriting standards were often abandoned entirely with respect to no-documentation loans (or "liar loans"), which "could be published without the 'burden' of paperwork." *See* Compl. ¶¶ 147, 154. At least one high-ranking witness even alleges that the Company regularly assisted applicants that had already been rejected for full-documentation loans in obtaining no-documentation loans instead. *See* Compl. ¶ 153 (statement Mark Zachary, former regional vice president of a Countrywide joint ven-

ture with a home builder). Significantly, these lapses in underwriting regularly extended to loans that Countrywide labeled as "prime," rather than subprime. *See id.* ¶ 156 (relating account of CW9, an auditor who examined loans being returned to the Company that had been labeled as "prime" but were clearly not).

According to the Complaint, significant deviations in underwriting were permitted even when it was clear that borrowers might not be able to pay. For example, the confidential witnesses state that under-qualified individuals were given loans for which they could not afford to make payments in the long term—for example, if and when their teaser rate was reset to a higher rate. *See* Compl. ¶ 148; *see also id.* ¶ 158–159 (noting that CW9, a compliance auditor, believed real estate speculators were given loans even though they "clearly could not even afford the first payment on the loans unless they could put a renter in the home immediately (or flip the house at a profit)"). The Complaint further alleges that some individuals were given loans based on knowingly inflated home appraisal values that would put them "upside down" immediately after purchase—and also more susceptible to default. *Id.* ¶ 150.

The Court finds that Plaintiffs' numerous confidential witnesses support a strong inference of a Company-wide culture that, at every level, emphasized increased loan origination volume in derogation of underwriting standards.[10] Supporting this Company-wide inference, the confidential and non-confidential accounts cited in the Complaint (1) emanate from several geographic areas, *see id.* ¶ 147 (providing similar testi-

---

**10.** While Defendants note that the Complaint cites the accounts of just 14 "former mostly low-level employees out of more than 50,000 in 600 offices," Individ. Defs.' Reply Supp. Mot. to Dismiss at 24, the goal at the pleading stage is not to conduct a census of current and former Countrywide's employees. Rath-

er, confidential witnesses may be used as "important sources . . . not only of falsity but also of scienter." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 711–712 (7th Cir. 2008) (Posner, J.), *on remand from Tellabs*, 127 S.Ct. 2499.

mony from former employees in Jacksonville, FL, Roseville, CA, Long Island, NY, Anchorage, AK, and Independence, OH); (2) span different levels of the Company hierarchy, *see id.* (underwriters, senior underwriters, senior loan officers, vice presidents, auditors, and external consultants remarking on the lack of adherence to Company standards in loan origination); and (3) remain consistent across different time periods, *see id.* (employees describing their experiences in 2004, 2005, 2006, and 2007). Strikingly, they tell what is essentially the same story—a rampant disregard for underwriting standards—from markedly different angles:

- an auditor who assessed loans returned to the Company found that many purported "prime" loans were issued to unqualified borrowers, *see id.* ¶ 156;

- a longtime executive who held two vice president positions discovered that particularly risky loans that were routed out of the normal underwriting process (because they violated underwriting standards) were in fact regularly being approved, with Defendant Sambol's involvement, *id.* ¶ 163;

- Mark Zachary, a vice president in Countrywide's joint venture with KB Homes, found that appraisers were inflating appraisal values, essentially raising the risk of default on loans, *id.* ¶ 153;

- underwriters at various levels and offices attested to egregious instances of underwriting, involving, for example, previously declined loans that would "come back to life" when new information qualifying the applicants would "miraculously appear," and loans that were provided pursuant to borrowers' patently ridiculous "stated incomes," *id.* ¶ 147; and

- a vice president in accounting left his job because he had been pressured to

alter Countrywide's financials by removing "bad loans" retroactively from the Company's loans held for investment, so as to create the impression of a better hedging relationship, *id.* ¶ 224.

The lowest level employees report that the impetus to "push" loans through came from above. *See id.* ¶ 147e (explanation of former Senior Underwriter that it was Company philosophy to close loans, even if it meant approving things that should not have been approved or making exceptions to the rules); *Id.* ¶ 147 (relating belief of CW's 1–3, former underwriters, that management, who pressured them to approve loans, were in turn pressured from "up top"). *See also id.* ¶ 162 (describing assertion of CW10, a former executive vice president, that Countrywide's senior management, and Sambol in particular, "didn't want to have to turn down any loan applications because [they] wanted to grow market share"). They also allege that the compensation structure promoted these practices by rewarding Company employees—from executives and management down to the underwriters—for increasing loan volume, but not for generating quality loans. *See, e.g., id.* ¶ 147 (relating CW's 1–3 belief that branch managers' compensation was tied to loan volume only); *id.* ¶ 113 (citing Wall Street Journal article noting that employees in one California branch office could win prizes, such as a trip to Hawaii, for selling the most pay option ARMs).

## 2. The Board Committee structure required outside director Defendants, except Dougherty and Snyder, to assess certain red flags and the Company's underwriting practices.

In order to show scienter, Plaintiffs are required to raise a "cogent and ... compelling" inference that the Defendants, and not just the confidential witnesses, were

aware or should have been aware of the widespread deviations from loan underwriting standards that were occurring in Countrywide's branch offices around the country. Defendants contend that none of the confidential sources are "alleged to have ever spoken or had other contact with any of the seven non-management directors ... and none is alleged to have personal knowledge relating to the two management directors." Countrywide Mem. Supp. Mot. to Dismiss at 16. However, evidence of this sort is not necessary here.

First, there is evidence that at least some of the high-ranking witnesses conveyed their concerns to even higher levels of the Company. *See, e.g., id.* ¶ 153 (alleging that former vice president reported his concerns about the Company's "low documentation" practices and inflated appraisals up the ladder); *Id.* ¶ 224 (stating that another former vice president reported to the CFO that one set of the Company's hedges was ineffective, resulting in an investigation by the Company's internal auditors). These accounts illustrate that problematic underwriting and origination practices were known to more than just the lowest level employees. *See also id.* ¶ 153 (account of former executive vice president that reports generated by the "Exception Processing System" and by the Chief Risk Officer were readily available to top executives and management).

More importantly, Plaintiffs argue that the nine Individual Defendants who are current or former outside directors would necessarily have known of alleged underwriting problems of this magnitude. These Defendants, they assert, were members of at least one of five Board Committees that was specifically tasked with monitoring detailed aspects of the Company's financial performance, business operations, and risk exposures: the Audit & Ethics Committee, the Credit Committee, the Finance Committee, the Operations & Public Policy Committee, and the Compensation Committee. In the course of their duties on these Committees, Plaintiffs contend, Defendants became aware of certain trends in the Company's finances, or "red flags," that implicated the significant lapses in underwriting. *Cf. Guttman v. Huang,* 823 A.2d 492, 503 (Del.Ch.2003) (holding that demand excusal on a failure of oversight claim requires plaintiff to identify, at the very least, "well-pled, particularized allegations of fact detailing the precise roles that these directors played at the company" and "the information that would have come to their attention in those roles"); *accord Rattner v. Bidzos,* No. Civ. A. 19700, 2003 WL 22284323 (Del.Ch. Oct.7, 2003).

More specifically, loan quality (and hence, the underlying underwriting practices) is most directly implicated in the performance of mortgages, MSRs, and retained interests that Countrywide held for investment. High quality loans could be expected to generate reliable streams of revenue. In contrast, loans that perform poorly would have a serious impact on Countrywide's balance sheet. Indications of weakness, such as signs of increased nonpayment or default, are "red flags" and raise questions about both the quality of the loans being originated and the adherence to standards in the underwriting process. Here, Plaintiffs point to at least two red flags of such prominence that Individual Defendants must necessarily have examined and considered them in the course of their Committee oversight duties: (i) the massive rise in negative amortization resulting from pay-option ARMs held for investment, and (ii) the increasing delinquencies in Countrywide's riskiest loans.[11]

---

11. The Court finds a number of Plaintiffs' other red flags are not probative of scienter,

First, a rise in negative amortization—from $29,000 in 2004 to $654 million in 2006—signaled that the Company's portfolio of pay-option ARMs was becoming increasingly risky. Compl. ¶ 72. Tellingly, 66% to 76% of the borrowers in pay-option ARMs were not making full interest payments (thereby accumulating negative amortization) in 2006–2007. Mozilo himself understood the reasons behind these trends as early as September 2006, after talking to some of those individuals personally. *Id.* ¶ 203 ("[The] general answer . . . was that the value of my home is going up at a faster rate than the negative amortization . . . I realized I was talking to a group . . . that had never seen in their adult life real-estate values go down.") Negative amortization, though formally recorded as profit on Countrywide's balance sheet, in fact added to the mortgage balances that pay-option ARM borrowers had to repay. *See id.* ¶ 17. As a result, the large majority of pay-option ARM mortgagees who were making only the minimum payment presented a serious risk of default, since at some point increasing loan balances might no longer be justified by rising home values.

According to the Complaint, pay-option ARMs composed a significant portion of the loans originated by Countrywide, reaching 19% of total loan originations in 2005. *Id.* ¶ 112. The total amount of pay-option ARMs that Countrywide held for investment also rose dramatically, from $4.7 billion in 2004 to $32.7 billion in 2006. *Id.* ¶ 118. At the same time, however, Plaintiffs allege that the vast majority of Countrywide's pay-option ARMs were low- or no-documentation mortgages that did not require full verification of a borrower's income or assets. *Id.* ¶ 116 (citing analysis in Wall Street Journal that noted that 78% of pay-option ARM originations in 2004 were low- or no-documentation, rising to 91 % in 2006, and that by the end of 2006, 81% of the pay-option ARMs that were held for investment fell into this category).[12] Approving pay-option ARMs—already one of the Company's riskiest products—on a low documentation basis further exacerbated the risk that borrowers would be unable to pay. *See id.* ¶ 139 (citing 2006 report of coalition of banking regulators that criticized the sale of "stated-income" pay-option ARMs for this reason). Given the scale on which pay-option ARMs were originated and held for investment, it is difficult to believe that the Individual Defendants were unaware of the implications of the meteoric rise in

---

including (1) the company's shift to riskier, non-traditional and non-conforming loans, (2) "the dramatic increase in retained interests held on Countrywide's balance sheet," Compl. ¶ 130, and (3) the fact that "the Company's valuations of MSRs, retained interests, and loans held for sale . . . [fluctuated] wildly without any basis," Compl. ¶ 230. The first two were the predictable result of business decisions made by the Company. Though both are sources of increased risk to the Countrywide's financials and further highlight the need for adequate oversight of the underwriting process, they do not implicate deficiencies in underwriting. As to the third of these additional red flags, Plaintiffs do not adequately explain how fluctuations in valuations of the interests relates to the quality of the underlying loans. For example, the Com-

plaint explains that the primary purpose of the Servicing Hedge, which was tied to the retained interests, was to hedge against the risk of a decline in interest rates. Compl. ¶ 217. The link between the pitfalls of other lenders (another "red flag" alleged by Plaintiffs) and underwriting standards is similarly attenuated.

12. Further exacerbating the situation, the Complaint alleges that Countrywide granted pay-option ARMs with very little down payment through the use of "piggyback mortgages" that resulted in a combined loan-to-value ratio of 90% or more. Compl. ¶ 117. Piggyback mortgages, like HELOCs, are second mortgages secured only by the difference between the value of a home and the amount due on a first mortgage. *See id.* ¶ 3 n. 2.

negative amortization, especially when the overwhelming majority of these loans were approved with little documentation by the borrower. *See id.* ¶ 110 (noting that stated-income loans requiring low or no documentation were widely known as "liar loans").

The second red flag noted by Plaintiffs relates to the increased delinquencies in the pay-option ARMs and HELOCs, the riskiest loan categories that Countrywide held for investment. For example, the percentage of pay-option ARMs in Countrywide's portfolio that were delinquent 90 days or more doubled from 2004 to 2005, and nearly tripled from 2005 to 2006. *See id.* ¶ 198 (0.1% in 2004, 0.22% in 2005, 0.63% in 2006). Likewise, the percentage of HELOCs that were delinquent doubled each year from 2004–2006. *Id.* (0.79% in 2004, 1.57% in 2005, 2.93% in 2006). Delinquencies in both categories, especially for pay-option ARMs, rose even more dramatically during each quarter in 2007. *Id.* As mentioned previously, loans held for investment served as an indicator for the Company's loan underwriting practices—practices which implicated all aspects of Countrywide's business, including sales into the secondary market. Notably, by late 2007, HELOCs and pay-option ARMs combined accounted for 74% of Countrywide's investment portfolio and were valued at $59 billion. *Id.* ¶ 264 (citing analyst report, released after Countrywide announced its 3Q07 financials, that noted HELOCs were 41% ($32 billion) and pay-option ARMs were 33% ($27 billion) of the investment portfolio at the time). The Individual Defendants could not afford to ignore rising delinquency rates with respect to those loans.

It is irrelevant that the data underlying these "red flag" trends were fully disclosed to investors. *See* Individ. Defs.' Mem. P. & A. Supp. Mot. to Dismiss at Appendix 1 (noting that disclosure of these trends in the SEC 10–K form for Fiscal Year 2005, released March 1, 2006). The Individual Defendants, unlike the investing public, were members of Board Committees charged with oversight of Countrywide's risk exposures, investment portfolio, and loan loss reserves.[13] As such, they were in a position to recognize the significance of these red flags, and, accordingly, investigate the extent to which underwriting standards had been abandoned. Notably, the underwriting violations, unlike the "red flags" themselves, were not disclosed to the public—indeed, Mozilo repeatedly assured investors of Countrywide's underwriting discipline and loan quality. *See id.* ¶¶ 141–146. Here, Plaintiffs have sufficiently alleged facts giving rise to a strong inference that Defendants on four specific Committees knew of the underwriting violations, or at the very least, proceeded with deliberate recklessness:

Audit & Ethics Committee members[14] are required to oversee the Company's risk management practices, its risk assessment policies, and Countrywide's exposures and liabilities with management. *Id.* ¶¶ 79–80 (committee charter). Loan origination is at the core of all of Countrywide's business operations, and risks related to loan performance and delinquency are central to the Company's overall risk position. Even more crucially, the Com-

---

**13.** Moreover, the Board committees met regularly and were presumably functioning as intended. For example, in 2006, the Audit & Ethics committee met 14 times; the Finance committee, 10 times; the Credit and Operations & Public Policy committees, 5 times each; and the Compensation committee, 29 times. *See* Compl. ¶¶ 78–97.

**14.** Defendants Melone, Parry, and Russell (and previously, Defendant Cisneros) are on the Audit Committee.

plaint identifies a number of Countrywide internal systems for analyzing risk for which the Audit & Ethics Committee has oversight responsibility: the office of the Chief Risk Officer, which generated monthly reports analyzing loan performance and adherence to underwriting policies, *id.* ¶ 168, and the proprietary Exception Processing System, designed to route highly risky loans to a central underwriting group for evaluation[15], *id.* ¶¶ 163–64. As they are responsible for managing these systems, members of this Committee were uniquely positioned to understand the contribution of underwriting standards to overall Company risk. Plaintiffs raise a cogent and compelling inference that Audit & Ethics committee members were aware of (or proceeded with deliberate recklessness with respect to) the significance of red flags relating to increasing delinquencies, negative amortizations, and other signs of loan nonperformance.

Likewise, members of the Credit Committee were charged with oversight of the Company's "credit risk management activities," or the ways in which Countrywide managed the risk that the Company would lose money if and when borrowers default on their mortgages. *Id.* ¶¶ 86–89.[16] This risk is closely connected with the quality of the underlying mortgages originated by Countrywide. The Credit Committee was also required to evaluate the adequacy of the Company's loan loss reserves, a judgment call in which the loans' future performance, though not the only factor[17], was highly relevant. *Id.* ¶¶ 88, 204.[18] Thus, the facts pled give rise to a compelling inference that Credit Committee members recognized the exponentially rising negative amortization on pay-option ARMs and the yearly doubling and tripling of delinquency rates on HELOCs and pay-option ARMs as serious warning signs related to credit risk.[19] At the very least, given that these two loan categories ultimately accounted for 74% of Countrywide's loan portfolio, or $59 billion worth of investments, there is a strong inference that Committee members proceeded with deliberate recklessness in the face of these warning signs.

Given the magnitude of pay-option ARMs and HELOCs held for investment, the Complaint also gives rise to a strong inference that members of the Finance Committee[20], which was in charge of reviewing investment strategy for the Company's loans, MSRs and retained interests,

---

**15.** The Exception Processing System flagged highly risky loans based on certain objective criteria, for example, if the loan-to-value ratio was too high when compared with the borrower's FICO score. Compl. ¶ 163.

**16.** Defendants Russell, Snyder, and Donato are on the Credit Committee; Defendants Parry and Robertson are also alleged to be members of this Committee during the Relevant Period.

**17.** Other factors included historic rates of loss and current economic and market conditions.

**18.** As alleged, the Board's prescription of loan loss reserves (discussed *infra*) do not independently contribute to a strong inference of scienter. Regardless of whether the loss reserves themselves were adequate or inadequate, the very process of evaluating the adequacy of the reserves required Credit Committee members to examine the red flags at issue here.

**19.** Negative amortization, in particular, added to the principal owed on mortgages and thus presented a special risk that a foreclosure sale would not fully cover the mortgage principal amount and would result in a credit loss. The problem is aggravated if the mortgage amount was based on an inflated home appraisal. *See* Compl. ¶ 117.

**20.** The Finance committee presently consists of Defendants Donato, Melone, and Russell, and previously included Defendants Parry and Robertson during the Relevant Period. *Id.* ¶¶ 90–93.

were aware of the red flags alleged—or proceeded with deliberate recklessness. Because the Finance Committee was required to oversee investments over the long term, ensuring loan quality was as essential to the Committee members here as it was to Audit & Ethics and Credit committees. Committee members either knew, or proceeded with deliberate recklessness with respect to, the fact that originating loans to borrowers who could not pay back their mortgages would ultimately be counterproductive, lucrative as it was in the short term.

Finally, the Operations & Public Policy Committee was charged with oversight of matters of "operational risk" and "matters relating to responsible lending." Here, plaintiffs have alleged that a pervasive "culture" encouraged underwriters to grant risky loans to unqualified borrowers; not only is loan quality at the core of Countrywide's operations, from its investment portfolio to its secondary market business, but the vast majority of loans held for investment, as well as a significant portion of total loans originated [21], were either pay-option ARMs or HELOCs. On such a large scale, the resulting issues of credit risk become matters of operational risk for the entire Company. For these reasons, Plaintiffs' facts give rise to an inference that members on this Committee proceeded, at the very least, with deliberate recklessness in the face of a number of red flags which they could not miss.

Lastly, while the Compensation Committee was responsible for evaluating whether the overall compensation structure establishes "appropriate incentives for management and other employees," *see* Compl.

¶ 84 (committee charter), it is unclear how these duties might have required Compensation Committee members to examine the red flags identified by Plaintiffs. Plaintiffs argue that a predictable consequence of tying compensation incentives solely to loan originations would be to increase pressure to generate lower-quality loans. That view, however, suggests that the policies of the Compensation Committee were a cause of the lapses in underwriting standards, not a reason that the Defendants on this Committee would have known of those lapses. Moreover, there are no facts from which the Court can infer that the Compensation Committee was aware of, or complicit in, setting the compensation structure for lower-level employees such as underwriters. *Cf. Accredited,* 2008 WL 80949, at *10 (finding probative of scienter allegations that defendants, who were Company executives and not outside Board members, "actually directed" deviations from Company policy by pressuring managers, who in turn pressured underwriters). Without more, the Court does not find membership on the Compensation Committee probative of scienter.[22]

### 3. The facts alleged, taken as a whole, establish a strong inference of scienter.

Plaintiffs have sufficiently pled facts regarding the directors' roles on various committees and the duties which required that they be informed on certain aspects of Countrywide's business. Because this information implicated underwriting practices at the core of Countrywide's business model, Plaintiffs raise a strong inference of

---

**21.** For example, in 2006, pay-option ARMs were 14% of total loans originated, and HELOCs were 10.2% of the total. Compl. ¶ 112.

**22.** For example, properly pled facts that illustrate how the Committee actually evaluated the effectiveness of the compensation struc-

ture, or facts that show that the Committee deliberately implemented an incentive structure, or approved of an incentive structure implemented by Countrywide executives, with the intent of generating greater loan volume, would be more probative of scienter.

scienter with respect to every outside director except Dougherty and Snyder.[23]

Under *Tellabs,* an inference of scienter must be "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs,* 127 S.Ct. at 2505. Here, the competing inference is that the Board consciously adopted a risky—but publicly disclosed—strategy by shifting to products such as HELOCs and pay-option ARMs. Under this theory, the Defendants were unaware of any alleged employee wrongdoing at the lower levels, and Countrywide's misfortunes resulted not from the Defendants' wrongdoing, but from an "unprecedented seizing up of the capital markets," *See* Individ. Defs.' Mem. P. & A. Supp. Mot. to Dismiss at 23. The directors were "simply unable to shield themselves as effectively as they anticipated," *Tripp v. Indymac Financial, Inc.,* No. CV 07–1635, 2007 WL 4591930, at *4, 2007 U.S. Dist. LEXIS 95445, at *9 (C.D.Cal. Nov. 29, 2007), when, caught by surprise, the secondary market demand for mortgage-backed securities issued by Countrywide and other lenders "suddenly evaporated" in August 2007. *See* Individ. Defs.' Reply Supp. Mot. to Dismiss at 5.

Two observations illustrate why the inference of scienter here is at least as plausible as this competing view. First, the idea that a Company-wide culture that encouraged unchecked deviations from underwriting standards in a way which would fatally affect the Company's continued financial performance went unnoticed by a Board of Directors simply does not square with the specific and comprehensive monitoring duties assigned to the members of the Board. The purpose of the Committee system is to monitor the operation, financial performance, and risk position of the Company. *See Miss. Pub. Emps. Retirement Sys. v. Boston Scientific Corp.,* 523 F.3d 75, 90–91 (1st Cir.2008) ("It is fair to infer the Company has highly effective information systems … Defendants are in a highly regulated industry and the company, it can be inferred, constantly monitors reports … and looks for prompt solutions to such problems.") (finding scienter under the *Tellabs* standard).

Second, while the Court will not engage in speculation as to the causes of the recent economic downturn, the Company's own SEC filings recognize that ongoing access to the secondary mortgage market requires the consistent production of quality mortgages and servicing of those mortgages at levels that meet or exceed secondary mortgage market standards. Compl. ¶ 104. *See also id.* ¶ 146 (March 2005 statement by Mozilo that Countrywide's "underwriting guidelines for nonconforming mortgage loans … have been designed so that these loans are salable in the secondary mortgage market"). Independent of any turmoil in the capital markets, the widespread violations of underwriting standards, as alleged, would significantly raise the risk of loan default.[24] When combined with what Plain-

---

**23.** Dougherty and Snyder were on the Compensation Committee, but were not on any of the other four committees discussed above. Accordingly, the motion to dismiss the § 10(b) claim is granted with respect to those two defendants. The Court removes them from the rest of the § 10(b) analysis, and does not include them when referring to "Defendants" or "Individual Defendants" hereafter.

**24.** This is especially true with respect to borrowers who were only capable of (or willing to) meeting their payment obligations in the short term, but not the long term. For example, the vast majority of pay-option ARM mortgagees were likely to make only the minimum payment only as long as housing values were rising more quickly than their accumulated negative amortization.

tiffs allege are misrepresentations concerning the quality of Countrywide's loans, these underwriting issues would ultimately undermine confidence in the secondary market for Countrywide products.[25]

In sum, the Complaint, viewed in its entirety, raises a strong inference of scienter with respect to all but two of the outside director Defendants. The inference of scienter is even stronger as to the inside directors (Mozilo and Sambol) and the non-director Defendants (Kurland, Garcia, and Sieracki). These defendants were involved in the day-to-day operation of the company and would have been even more aware of a "culture" of undisciplined loan origination, if one existed, than would the outside Defendants. Moreover, the executive Defendants were privy to the company's risk management systems on an ongoing basis. The Complaint quotes a confidential witness who asserts that reports generated by the Chief Risk Officer were regularly delivered to those executives, and that they also had access to the data contained in the Exception Processing System. The same inferences that apply to the outside directors apply here, albeit with even greater force: it would be difficult to conclude that those Defendants at the top levels of Countrywide management did not know what was going on in their entire business.

The Court proceeds by addressing the other allegations in dispute, as well as the other requirements of § 10(b) and segments of the Motions to Dismiss.

### 4. The repurchase insider trading allegations are consistent with the strong inference of scienter, and particularly probative of scienter for Mozilo.

■ Allegations of insider sales during the Relevant Period permeate the Complaint. The PSLRA "neither prohibits nor endorses the pleading of insider trading as evidence of scienter, but requires that the evidence, like all other evidence, meet the 'strong inference' standard." *In re Daou Systems, Inc.*, 411 F.3d 1006, 1022 (9th Cir.2005) (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197 (1st Cir.1999)). The key inquiry is whether the insiders' sales of stock are "suspicious," namely, whether they are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir.1999). In evaluating stock sales, relevant factors include (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history. *Id.*

Plaintiffs' most specific allegations of insider sales concern the share repurchase program, in which the Company repurchased common stock in November 2006 (38.6 million shares for $1.5 billion) and May 2007 (21.5 million shares for $900 million). Both of the repurchases occurred at times where the stock was near its all time high, and Plaintiffs allege that a stock repurchase "signal[s] to the market that the Board believed Countrywide's shares to be underpriced." *Id.* ¶ 325.

**25.** Based on public statements in early 2005 and 2006, Mozillo himself realized (i) the need for underwriting discipline in originating subprime mortgages and (ii) the possibility that the housing market might, in fact, decline in the near future. *See* Compl. ¶ 144 ("[T]his is dangerous stuff ... Maintaining [strong] discipline [in the origination of subprime loans] is critically important to us"); *id.* ¶ 234 (predicting, in an early 2006 interview, general declines in housing prices across the country, with declines as high as 30% in certain areas).

Yet, at the same time, Defendants reaped $52 million in stock sale proceeds during the first repurchase quarter, and $96 million during the second. How could the Board members approve a repurchase of $2.4 billion dollars worth of stock, and nearly contemporaneously liquidate $148 million of their personal holdings just months before the stock dropped some 80–90%? At the very broadest level, Plaintiffs outline the facts that render the stock repurchase and some of the insider sales suspicious. Specifically:

- Defendant Donato sold shares worth $1.3 million on October 27, 2006, "right when the buyback was announced," and additional shares on December 15, 2006, just after the first repurchase period. *Id.* ¶ 405f. Donato's last previous sale was nearly two years before the 2006 sales.

- Defendant Dougherty adopted his Rule 10b5–1 plan during the first repurchase month (November 2006) and had no sales two years prior to implementation of the plan. *Id.* ¶ 405a.

- Defendant Cunningham, who had instituted a Rule 10b5–1 plan in March 2006 to sell 5,000 shares a month, sold an additional 20,000 shares on February 2, 2007, the day after his last sale under this plan, coinciding with the all-time high for Countrywide stock. *Id.* ¶ 405c.

- Defendant Cisneros sold 75% of his holdings on two days in May of 2006, for proceeds of over $3 million. *Id.* ¶ 405e.

- Defendant Snyder sold 20,000 shares on December 16, 2006 for $800,000. *Id.* ¶ 405d.

- Defendant Robertson sold 60,000 shares, or two-thirds of his shares for proceeds of $2.4 million on November 20, 2006. *Id.* ¶ 405b.

- Defendant Garcia also adopted a Rule 10b5–1 plan at the same time as the announcement of the stock repurchase in late October 2006, and sold 230,000 shares for proceeds of $9 million pursuant to that plan. *Id.* ¶ 411. Independently, he sold 189,757 shares on Feb. 2, 2007 for proceeds of $8.5 million. *Id.*

- Defendant Sambol sold 168,000 shares for proceeds of $6.6 million during the first repurchase quarter, and 65,375 shares for proceeds of $2.4 million during the second. *Id.* ¶ 326.

Defendants respond with explanations for some of the sales that mitigate the inferences of scienter. Dougherty's plan, for example, was instituted at the end of a "blackout period" and as he was preparing for retirement. Both Cunningham and Snyder sold stock in between the two repurchase periods. Cisneros' large sale in May 2006 does not appear to be dramatically out of line with his previous sales in 2004 and 2005. Finally, Robertson's large sale occurred during the repurchase, but its timing is also "consistent with his pattern of selling roughly every six months." Countrywide Reply Supp. Mot. to Dismiss at 6 n. 1; Compl. App. 1 (listing Robertson's other Relevant Period sales in November 2005, May 2006, and July 2007).

Defendants' competing explanations for these insider sales illustrate the flaw in Plaintiffs' insider trading allegations. While the Plaintiffs outline basic facts that give rise to suspicion, they fail to tie the insider sales to the repurchase by offering sufficient detail. Plaintiffs provide little information about the stock repurchase itself. They omit details such as precise dates or terms and fail to provide any particularized allegations suggesting that the directors approved the repurchase for the purpose of inflating the stock price, or that the repurchase did in fact cause inflation of the stock. Nor do Plaintiffs tie the suspicious insider sales to the timing of the

repurchase with any precision. For example, within the quarters in which the repurchase took place, Plaintiffs generally do not distinguish shares sold during times when the repurchase would have an effect on the stock price (after it was announced, for example) and those that were not.

The Court does conclude, however, that Plaintiffs' repurchase-related insider trading allegations "inasmuch as they are at least consistent with their theory of fraud, provide some support against the [Defendants'] Motion to Dismiss." *Boston Scientific*, 523 F.3d at 92 (citations omitted) (finding that "insider trading claims as alleged are on the weaker end of the spectrum"). In conjunction with the conclusions reached in the previous sections,[26] the repurchase program could properly be viewed as an attempt to keep the ball rolling—i.e. to propel the Company forward (steadying the stock price, or sending it upward) for a period of time before the weight of the loan origination practices began taking its toll on the Company's operations and the value of its stock. Defendants' massive sales between November 2006 and May 2007 are entirely consistent with that view.

Plaintiffs' insider trading allegations for the remainder of the four year Relevant Period are also flawed. The Complaint reveals few details: the date of each stock sale during the Relevant Period, the amount sold, and the profit each made on those sales. Compl. ¶ 322; *Id.* App. A. Obviously the total stock sales by all the Defendants over the entire Relevant Period, $848.6 million, is a substantial sum.

But the Complaint fails to indicate how these stock sales are suspicious in light of, for example, each insider's prior history of stock sales or the various public statements at issue here. Similarly, Plaintiffs fail to specify what percentage of each Defendant's total shares was sold during the Relevant Period (though notably, this factor declines in importance as the absolute magnitude of the sale increases, *see., e.g., Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir.2004)).

### a. The timing of Mozilo's amendments to his 10b5–1 plans are probative of scienter.

In contrast with the dearth of detail provided by the broadest (non-repurchase related) allegations of insider trading, the Complaint devotes an entire section explaining why Mozilo's stock sales are suspicious. While Mozilo utilized 10b5–1 plans for his sales [27], he actively amended and modified his 10b5–1 plans. Mozilo's original 10b5–1 plan was established on April 26, 2004, and provided for the sale of roughly 200,000 to 250,000 shares each month; it expired in May 2006. Compl. ¶¶ 331–332. Subsequently, he implemented two additional plans on October 27, 2006 and December 12, 2006. *Id.* ¶¶ 332–33. He later amended the December plan to double the number of shares on February 2, 2007, the date on which Countrywide stock reached an all time high of $45.03 a share. *Id.* ¶ 334. After these amendments, Mozilo's plans allowed him to sell 580,000 shares per month. *Id.* These

---

26. The Court previously concluded that Plaintiffs did not establish that Snyder and Dougherty are subject to the strong inference of scienter. The insider trading allegations with respect to those Defendants cannot overcome that failure.

27. Plaintiffs make the entirely new accusation, mentioned nowhere in their 200 page

Complaint, that Mozilo violated the terms of his April 26, 2004 10b5–1 stock plan by selling more than was permitted, and furthermore, filed "false and misleading Form 4s with the SEC." Pls.' Opp'n to Defs.' Mots. To Dismiss at 41. The Court declines to address this allegation on this Motion to Dismiss, where it was not included in the Complaint.

plan amendments sparked scrutiny by the media. *See id.* ¶¶ 337–338.

Mozilo's actions appear to defeat the very purpose of 10b5–1 plans, which were created to allow corporate insiders to "passively" sell their stock based on triggers, such as specified dates and prices, without direct involvement. *See* Compl. ¶ 329. Accordingly, his amendments of 10b5–1 plans at the height of the market does not support the inference "that the sales were pre-scheduled and not suspicious," Individ. Defs.' Mem. P. & A. Supp. Mot. to Dismiss at 7. The October 27, 2006 plan for example, was instituted, according to Plaintiffs, mere days after the announcement of the first stock repurchase; the December 12, 2006 plan commenced shortly after that repurchase concluded. And the February 2, 2007 amendment occurred on the day when Countrywide stock reached a historic high.

Defendants point to other factors that undermine the inference of scienter, such as the fact that Mozilo negotiated a new performance based employment contract in December 2006; that each individual sale made by Mozilo was only a small proportion of his total shares; that the shares in his plans had a $28 floor. *See* Individ. Defs.' Mem. P. & A. Supp. Mot. to Dismiss at 8, Countrywide Mem. Supp. Mot. to Dismiss at 19. These factors do not mitigate the inference of scienter given the magnitude and timing of Mozilo's trading. Over the Relevant Period, Mozilo received $474.49 million in stock proceeds, including over $118 million in 4Q06 and 2Q07. It is irrelevant that Mozilo held on to over 7 million shares of Countrywide stock through the end of 2007, even as the market was falling. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1232 (9th Cir.2004) ("where, as here, stock sales result in a truly astronomical figure, less weight should be given

to the fact that they may represent a small portion of the defendant's holdings").

### 5. The accounting allegations do not contribute to a strong inference of scienter.

■ Significant GAAP violations, described with particularity, may provide "powerful indirect evidence of scienter." *In re Daou Sys. Inc.,* 411 F.3d 1006, 1016 (9th Cir.2005). In order to demonstrate scienter in this fashion, the Complaint must allege "enough information so that a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue." *Id.* at 1017 (internal quotes omitted). Moreover, they "must show with particularity how the adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position." *Id.* at 1018. Here, Plaintiffs allege that Defendants violated GAAP in two ways: by failing to increase loan loss reserves on the loans Countrywide held for investment and by failing to effectively hedge with respect to the MSRs and retained interests.

### a. Allegations of the failure to increase loan loss reserves are insufficiently pled.

■ Plaintiffs allege that the loan loss reserves violated GAAP because they were inadequate to account for the risk presented by the mortgages in Countrywide's portfolio. This allowed Defendants to overstate Company revenue and deceive the market as to this risk. In particular, the Complaint alleges that the loan loss reserves, as a percentage of loans held for investment, decreased by more than half from 2002 to 2003 and remained at this level until 2007, even though Countrywide added riskier loans to its portfolio during this time. It also notes that Country-

wide's reserves were significantly lower than those of other several other banks that had two to four times the amount of loan loss reserves (measured relative to their total loans held for investment).

Plaintiffs have not pled a violation of GAAP with sufficient particularity to provide independent evidence of scienter. Their strongest evidence of such a violation is the fact that the reserves, as a percentage of the total loans held for investment, sunk to a markedly lower level between 2003 and 2006, and then rose drastically in 2007.[28] While this statistic is suggestive, especially given that riskier loans may require greater reserves, it is also apparent that the setting of loan loss reserves involves a great deal of discretion.[29] *In re Aegon N.V. Sec. Litig.*, No 03 Civ. 0603, 2004 WL 1415973 (S.D.N.Y. June 23, 2004). Certainly, even if Countrywide's reserves were on the low side of normal during the 2003–2006 period, they were not sufficiently troublesome as to raise problems with the Company's independent auditors.[30] *Cf. Atlas v. Accredited Home Lenders Holding Co.*, No. 07–CV–488H, 2008 WL 80949 at *10 (S.D.Cal.

Jan.4, 2008) (finding that understated loan loss reserves violated GAAP where auditor refused to approve financial statement and subsequent auditor required those reserves to be retroactively increased by over $30 million). Moreover, any comparison of loan loss reserves held by industry competitors is useless without information about the composition of their loan portfolios.

It is unclear from the face of the Complaint whether Countrywide's reported loan loss reserves can be considered misleading. The loan loss reserve allegations build upon the existing inference of scienter—that Defendants knew serious departures from underwriting standards would result in the origination of low-quality loans (or that they acted with deliberate recklessness with respect to this possibility). However, given the discretion inherent in the setting of loan loss reserves, and the use of independent auditors, Plaintiffs have not adequately pled particularized facts that show that the loan loss levels were, in fact, so low that they were false and misleading.[31] As pled, they do not contribute to scienter.

---

**28.** Countrywide increased the loan loss reserves to $1.84 billion by the end of 2007 (an over 700% increase compared to the $261 million at the end of 2006). However, this fact, standing alone, is also insufficient to establish scienter. *See Lindner Dividend Fund, Inc. v. Ernst & Young*, 880 F.Supp. 49, 58 (D.Mass.1995) (substantial increase in loan loss reserves due to market conditions is not evidence that the reserves stated in earlier statements were inadequate).

**29.** Defendants also object that Plaintiffs do not consider another critical factor in the loan loss analysis: the expected amount of value that would be recovered through foreclosures on the underlying collateral.

**30.** The Court agrees with Defendants that the use of outside, independent auditors does not raise an issue of fact that cannot be resolved on this motion. Plaintiffs have not, in fact,

provided a basis for concluding that Countrywide's auditors were unreasonable.

**31.** Defendants raise the further possibility that substantially increasing loan loss reserves to account for future losses that would result from badly underwritten loans might in *itself* violate GAAP. GAAP allows reserves only for those future losses that are (i) "probable" as of the reporting date and (ii) reasonably capable of being estimated. Individ. Defs.' Reply Supp. Mot. to Dismiss at 15 (citing FAS 5). Furthermore, losses "should not be recognized before it is probable that they have been incurred, even though it may be probable based on past experience that losses will be incurred in the future" and that "[i]t is inappropriate to consider possible or expected future trends that may lead to additional losses." Individ. Defs.' Reply Supp. Mot. to Dismiss at 15–16 (citing FASB guidance document for FAS 5). Plaintiffs do not cite or discuss these accounting rules in their Com-

### b. The alleged overvaluation of retained interests and failure to hedge also provide little independent evidence of scienter.

Likewise, Plaintiffs allege that the values of MSRs and retained interests were overstated, and that the Company's hedging practices were ineffective. They note that the fact that both the Servicing Hedge and the hedge on the valuation of its loans held for sale, despite the Company's assurances, ultimately failed to guard Countrywide against fluctuations in the market.[32]

Plaintiffs' allegations concerning the effectiveness of the Servicing Hedge are not relevant to scienter. The Hedge was designed to cancel out changes in valuation as to the MSRs and retained interests due to fluctuations in interest rates—a buffer against the risk that interest rates will decline, causing the value of these assets to fall. Interest rate risk, however, is present regardless of the underwriting quality of the underlying loans. Moreover, the nature of Countrywide's hedging practices, far from being concealed by Countrywide, were well-disclosed. For example, the 2006 SEC 10–K form disclosed an imperfect hedging relationship with respect to the Servicing Hedge in 2004, 2005, and 2006, which often resulted in overall losses. *See* Compl. ¶ 218; Individ. Defs.' Reply Supp. Mot. to Dismiss at 19–20.

Plaintiffs' most compelling evidence comes from CW11, a former vice president and director in the Capital Markets Accounting Department, who claims he was asked by the "Executive Vice President of Finance" for Capital Markets to "cover up" ineffective hedging in a certain segment of the Company's hedging activities by retroactively, and wrongfully, altering the assets being hedged. Compl. ¶¶ 221–229. CW11 ultimately left the Company because he would not remove these assets—which were "bad loans"—to improve the performance of the hedge. This account suggests that some senior Company management knew of problems in the loan portfolio and were willing to cover them up. However, without evidence of a wider scheme to obscure the risk of retained interests, little is added by this one confidential source.

### 6. Conclusion

Plaintiffs have created a strong inference of scienter under the PSLRA, for all of the outside directors except Defendants Dougherty and Snyder, that is at least as plausible as any competing inference. The Court draws its conclusion based on the strength of the allegations regarding Countrywide's loan origination practices and the duties of Board Committees to monitor high-level indicators of financial performance and credit risk that related directly to those problematic underwriting practices. The stock repurchase and associated stock sales also weakly contribute to the Court's conclusion of scienter. However, the accounting allegations are inadequately pled.

### 2. Material misstatements

■ Having established scienter, it is straightforward to identify which of the statements made by the Defendants were false and misleading. As explained above, the Complaint alleges five categories of false and misleading statements: press releases (including ones in 1Q04, 3Q04, 3Q05,

---

plaint or brief, and thus do not adequately plead that the losses were "probable" at the time of reporting, or that the magnitude of the loss could reasonably be estimated.

**32.** Plaintiffs also allege that valuations of MSRs and retained interests were based on "improper assumptions causing the valuations to fluctuate wildly without any basis," Compl. ¶ 230, but this does not appear to be relevant to scienter.

and 1Q06); conferences calls (including calls in April 2004, April 2005, and May 2005); SEC 10–K and 10–Q filings (including the Form 10–K's for 2004, 2005, and 2006); proxy statements for the annual shareholder meetings in 2005, 2006, and 2007; and continued statements in 2007 about Countrywide's financial prospects. These statements included representations, for example, that Countrywide actively managed credit risk, applied more stringent underwriting standards for riskier loans such as ARMs, and only retained high credit quality mortgages in its loan portfolio. *See, e.g.,* Compl. ¶¶ 284–289. The importance of the quality of Countrywide's loans held for both sale and investment underscores the materiality of these statements. *See Atlas v. Accredited Home Lenders Holding Co.,* No. 07–CV–488, 2008 WL 80949 at *9 (S.D. Cal. Jan 4, 2008) ("Although Defendants' allegedly false and misleading statements regarding Accredited's underwriting policies are not as easily quantified, as a mortgage lender, Accredited's underwriting practices would be among the most important information looked to by investors.") Plaintiffs allege that these statements are false and misleading because they failed to disclose the magnitude of risk of default on loans that were not originated in accordance with the Company's underwriting standards.

Furthermore, not only did Countrywide label some individual loans as "prime" even when they were not, *see* Compl. ¶¶ 156–59 (account of CW9), but they also mislabeled a large portion of their HELOCs as "prime," when they were actually "just as risky as other lenders' sub-prime loans," *see id.* ¶ 245. Plaintiffs identify the mislabeling of these loans as an additional category of false and misleading statements.

Defendants object that no alleged misstatement is attributed to an outside director, and that their signatures on the 10–K forms for 2004, 2005, and 2006 are "not enough, in and of [themselves], to sufficiently plead a securities fraud claim" against those directors. Individ. Defs.' Mem. P. & A. Supp. Mot. to Dismiss at 9 (citing *Wojtunik v. Kealy,* 394 F.Supp.2d 1149, 1165 (D.Ariz.2005)). However, Plaintiffs have adequately pled scienter as to each Individual Defendant, including the outside director defendants except for Dougherty and Snyder, by alleging facts as to "the precise roles that these directors played at the company [and] the information that would have come to their attention in those roles." *Guttman v. Huang,* 823 A.2d 492, 503 (Del.Ch.2003). This is not a situation, then, in which the outside directors are being held liable due solely to their signatures on the 10–K forms. *Cf. Howard v. Everex Sys., Inc.,* 228 F.3d 1057 (9th Cir.2000) (finding scienter as to defendant CEO who was not involved in the preparation of allegedly misleading statements because he signed misleading document that was presented to him).

Finally, Defendants argue that one particular statement highlighted in the Complaint is not false or misleading because it qualifies as a "forward-looking statement" under the "safe harbor" provision of the PSLRA. *See* 15 U.S.C. § 78u–5(c)(1)(A). They point to the 2004 Form 10–K, which declares that Countrywide "actively manages credit risk to achieve its 'profitability and return on capital *objectives*' while meeting the Company's '*expectations* for consistent financial performance.' " Individ. Defs.' Mem. P. & A. Supp. Mot. to Dismiss at 14 (emphasis in original). Even if it qualifies as a protected statement, which is unclear [33], it is only one of numer-

---

**33.** This appears to be a statement of fact about the Corporation's present situation, not a forward looking statement. *See id.* § 78u–5(i)(1) (defining "forward-looking statement" as, among other things, "a statement containing a projection of revenues," "a statement of

ous statements that were made during the Relevant Period on the same subject, and therefore does not act to immunize Defendants' other alleged misstatements regarding the management of credit risk.

### 3. Reliance

Defendants argue that Plaintiffs, in seeking to assert a derivative § 10(b) claim on behalf of the corporation, have failed to prove that Countrywide relied, directly or indirectly, on the Individual Defendants' false and misleading statements in purchasing stock in November 2006 and May 2007. They argue that reliance can be pled in a derivative § 10(b) claim only if "the corporate decision-maker for the repurchase of shares had no knowledge of the alleged fraud," *In re Verisign, Inc., Deriv. Litig.,* 531 F.Supp.2d 1173, 1209 (N.D.Cal.2007). Because Plaintiffs allege that the same persons who made the fraudulent misstatements also made Countrywide's repurchase decision, Defendants contend that reliance here is impossible. Individ. Defs.' Mem. P. & A. Supp. Mot. to Dismiss at 19.

■ However, modern courts have permitted such claims to proceed. *See Estate of Soler v. Rodriguez,* 63 F.3d 45, 54 (1st Cir.1995) ("It is by now well established that a corporation has a claim under § 10(b) if the corporation was defrauded in respect to the sale of its own securities by some or even all of its directors"). Under this theory, reliance is only foreclosed when the shareholders, not only the officers and directors, are involved in the alleged fraud. *In re Whitehall Jewellers, Inc. Sh. Deriv. Litig.,* No. 05 C 1050, 2006 WL 468012, at *12 (N.D.Ill. Feb.27, 2006) (following "the general rule that the knowledge of the allegedly defrauding directors will not be imputed to the corpora-

tion to negate reliance without disclosure by the allegedly defrauding directors and ratification by the remaining directors or shareholders"). To the extent that a contrary rule is set forth in the *Verisign* decision, this Court declines to follow it.

■ Regardless of whether actual reliance has been shown here, it may be also pled indirectly. Under the "fraud on the market theory," the plaintiff benefits from a presumption "that he has indirectly relied on the alleged misstatement, by relying on the integrity of the stock price established by the market." *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1114 (9th Cir.1989). A fraud on the market plaintiff must allege that he was induced to trade stock "not by any particular representations made by corporate insiders," but by "the artificial stock price set by the market in light of statements made by the insiders as well as all other material public information." *Id.* Plaintiffs have sufficiently done so here. *See* Compl. ¶¶ 475–480.

### 4. Loss and Loss Causation

■ Dougherty argues that Plaintiffs fail to allege loss causation—a "causal connection between the material misrepresentation and the loss," *Dura Pharm. v. Broudo,* 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)—because Countrywide canceled the shares of stock that it repurchased as soon as it bought them, and thus did not hold the stock when the market price began to decline. Plaintiffs respond that whether or not Countrywide technically held its own stock, they have adequately alleged that the Company did, in fact, suffer large losses that were caused by Defendants' material misrepresentations.

the plans and objectives of management for future operations," or "a statement of future economic performance").

As Plaintiffs have not adequately pled scienter with respect to Dougherty, the Court need not consider his argument, which is not adopted by the other Defendants. The Court notes, however, that it would side with Plaintiffs' view over Dougherty's interpretation of § 10(b) and Rule 10b–5. *Dura* held only that there needs to be a causal relationship between a share price that is allegedly inflated due to defendants' fraudulent misrepresentations and any later economic loss. 544 U.S. at 342, 125 S.Ct. 1627. Here, Plaintiffs allege that Defendants' fraud artificially inflated Countrywide stock, which later endured a number of precipitous drops in value as the truth regarding its financial condition was disclosed; and that Countrywide repurchased its own stock while it was fraudulently inflated. Beyond the causal relationship requirement, nothing in *Dura* requires that the plaintiff (here, the Company) refrain from canceling repurchased shares.[34]

For all of these reasons, the motion to dismiss for failure to state a § 10(b) claim is denied with respect to all Defendants except Dougherty and Snyder.

## B. Exchange Act § 20(a)

Defendants argue that Plaintiffs have failed to state a claim for control person liability under § 20(a) of the Exchange Act only to the extent that Plaintiffs have not adequately stated a claim under § 10(b). On this theory, the plaintiff must plead "that a primary violation" of § 10(b) "was committed and that the defendant 'directly or indirectly' controlled the violator." 15 U.S.C. § 78t(a); *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir.1996). Because a primary viola-

tion of § 10(b) has been adequately pled here, Defendants' motion to dismiss this claim is denied.

Defendant Dougherty also alleges that the § 20(a) claim fails because Plaintiffs do not plead that Dougherty "controlled any 'violator' of § 10(b)." Because the Court has found that Plaintiffs fail to plead a primary violation of § 10(b) as to Dougherty, the Court need not address this argument.

## C. Exchange Act § 20A

■ Section 20A of the Exchange Act creates a private cause of action for "contemporaneous" insider trading. *See* 15 U.S.C. § 78t–1. To satisfy § 20A, a plaintiff must plead (i) a predicate violation of the securities laws, *see id.;* and (2) facts showing that the trading activity of plaintiffs and defendants occur "contemporaneously," *see Neubronner v. Milken,* 6 F.3d 666, 670 (9th Cir.1993). The duration of the period in which an insider defendant's trade can be considered "contemporaneous" with the plaintiff's is "not fixed," and the Ninth Circuit in *Milken* expressly declined to elaborate on its "exact contours." *Id.* As a result, courts have interpreted the requirement in varying ways. *See In re AST Research Sec. Litig.,* 887 F.Supp. 231 (C.D.Cal.1995) (plaintiff's trade must occur on same day in order to be contemporaneous); *Alfus v. Pyramid Technology Corp.,* 745 F.Supp. 1511, 1522 (N.D.Cal.1990) (few days); *Middlesex Retirement System v. Quest Software Inc.,* 527 F.Supp.2d 1164, 1195–1197 (C.D.Cal.2007) (rejecting the same-day approach of *AST Research)* (citing *In re Am. Bus. Computers Corp. Sec. Litig.,* MDL No. 913, 1994 WL 848690, at

**34.** Indeed, the *Verisign* case, which is heavily relied upon by the other Defendants, found that Plaintiffs in a derivative case failed to allege 10b–5 loss causation only "because VeriSign's stock went up, not down," after news related to the board of directors' alleg-

edly fraudulent behavior came to light—not because the corporation may not have formally held onto its own shares after a stock repurchase. *In re Verisign, Inc. Deriv. Litig.,* 531 F.Supp.2d 1173, 1207–1208 (N.D.Cal. 2007).

*4 (S.D.N.Y. Feb.24, 1994) ("the term 'contemporaneously' may embrace the entire period while relevant material non-public information remained undisclosed")).

■ Defendants object that Plaintiffs have not pled with specificity the actual days on which Countrywide repurchased its own stock according to the repurchase plan during the months of November 2006 and May 2007. The Court agrees with Plaintiffs that a narrow interpretation of "contemporaneously" is not warranted here, where the actual days on which Countrywide traded its stock is not significant. Rather, the fact that the repurchase program was conducted during November and the following May is sufficiently specific.

Defendants further object to Plaintiffs' § 20A claim because that cause of action is only intended "to protect unsophisticated traders who 'suffer the disadvantage of trading with someone who has superior access to information.'" Individ. Defs.' Mem. P. & A. Supp. Mot. to Dismiss at 20 (citing *Middlesex*, 527 F.Supp.2d at 1195). Plaintiffs point out, however, that the plain language of the statute contains no such limitation as to who may bring a § 20A claim. *See also* 15 U.S.C. § 78t–1(b) (no requirement for unsophisticated investor in section entitled "limitations on liability"). While Defendants contend that they know of no authority permitting a § 20A claim to be asserted derivatively, they likewise point to no authority that forbids it.

Accordingly, because Plaintiffs have stated a § 10(b) claim as to all Defendants except Dougherty and Snyder, they similarly plead a violation of § 20A.

## D. Exchange Act § 14(a) and Rule 14a–9

■ Section 14(a) and Rule 14a–9 prohibit (1) a false or misleading declaration of material fact in a statement soliciting a proxy, or (2) an omission of material fact that makes any portion of the proxy statement misleading. *See* 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a–9. *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022 (9th Cir. 2000).[35] As with the § 10(b) securities fraud allegations, the essence of Plaintiffs' proxy-related allegation is the failure to disclose the true operational and financial state of Countrywide to shareholders. In particular, Plaintiffs allege that it was false and misleading to omit, in Countrywide's 2005, 2006, and 2007 proxy materials, "the material fact that Individual Defendants ... [were] making undisclosed fundamental changes to the Company's business model that relied on riskier products ... in order to inflate its stock price and drive its short-term performance." Compl. ¶ 308.

Specifically, they argue that if shareholders had been told the truth about the Company, they would have never voted (1) to reelect the current directors in those three years; or (2) to approve two compensation plans for executives and directors: the 2005 Annual Incentive Plan and the 2006 Equity Executive Plan. *Id.* ¶¶ 307–311. These plans permitted the Compensation Committee to grant performance-based awards for meeting certain measures of financial performance. *Id.* The compensation plans, then, gave Defendants a powerful incentive to continue concealing the true nature of the Company's risk position in order to boost the

---

**35.** It is well established that such a claim may be brought derivatively, because "interference with the processes of corporate democracy results in direct harm to the corporation [as well as] to shareholders who were actually deceived." *Gaines v. Haughton*, 645 F.2d 761, 774 (9th Cir.1981), *overruled on other grounds, Matter of McLinn*, 739 F.2d 1395 (9th Cir.1984).

Company's reported financial performance, and achieve the "performance measures," such as earnings, financial return ratios, net income, and stock price, for which they could be awarded bonuses.

Plaintiffs also identify statements in the 2006 and 2007 proxy materials that they allege are affirmatively false and misleading. In opposition to shareholder proposals that would have permitted shareholders at each annual meeting to express approval or disapproval of executive pay practices via an advisory vote, Countrywide issued statements assuring shareholders that its executive compensation policies and programs were, in fact, effective. *Id.* ¶¶ 314, 318. As evidence, the 2007 proxy further touted the "extraordinary [financial] results, especially in light of a transitioning business environment," *id.* ¶ 318, achieved by management. Plaintiffs argue that the compensation policies were no longer functioning properly because they gave Defendants an illicit incentive that was not aligned with shareholder interests.

### 1. Legal standard

■ The "requisite level of culpability" under § 14(a) and Rule 14a–9 depends on whether or not the allegations "sound[ ] in fraud." *See Desaigoudar*, 223 F.3d at 1022–23. If they do not sound in fraud, allegations of negligence, pled particularly, are sufficient. *See In re McKesson HBOC, Inc. Securities Litigation*, 126 F.Supp.2d 1248 (N.D.Cal.2000) (concluding that the PSLRA's particularity requirement applies to Rule 14a–9 claims regard-

less of the mental state required). On the other hand, a complaint that sounds in fraud is subject to the requirements of both Fed.R.Civ.P. 9(b) and the heightened pleading standard of the PSLRA, and fraud must be pled with particularity. *Desaigoudar*, 223 F.3d at 1022–23. Though Plaintiffs insist that negligence is the appropriate standard, the complaint clearly sounds in fraud, and thus both Rule 9(b) and the PSLRA apply.[36]

### 2. Analysis

Defendants argue that Plaintiffs' proxy statement challenges are based solely on the failure to disclose the breaches of fiduciary duty asserted elsewhere in the complaint. They point out, however, that failure to disclose a breach of fiduciary duty is not material for § 14(a) purposes. *See Gaines v. Haughton*, 645 F.2d 761, 776–77 (9th Cir.1981), *overruled on other grounds, Matter of McLinn*, 739 F.2d 1395 (9th Cir.1984). They also assert that Plaintiffs have not identified with particularity the reasons why the proxy statements identified in the Complaint would have been misleading to an investor.

■ Plaintiffs here have adequately identified which statements they believe to be materially misleading, and why.[37] Contrary to Defendants' assertion, Plaintiffs' proxy allegations are not limited to a failure to disclose a breach of fiduciary duty. Rather, they allege that the proxy statements failed to disclose that Countrywide abandoned its underwriting standards, thus exposing itself to an undisclosed level

---

**36.** The tone of the allegations leaves no doubt that fraud, not negligence is at issue: Plaintiffs allege that the proxy statements failed to disclose that senior officers were being "rewarded ... for running Countrywide into the ground" and "profiting from such malfeasance before the true value of the Company because known by the Company's other shareholders." Compl. ¶ 315.

**37.** Plaintiffs also appear to assert that materiality is a highly factual question that should not be determined on a motion to dismiss. However, determining whether the allegations are materially misleading is precisely the inquiry to be undertaken under the PSLRA, which governs this § 14(a) claim on a motion to dismiss.

of heightened risk. The allegations that the directors breached their duties in failing to monitor the Company's adherence to underwriting standards is of secondary importance to Plaintiffs' Rule 14a–9 case.

Furthermore, the "true operational and financial state of Countrywide" would have been material to shareholders during a proxy vote because of its impact on the Company's balance sheet. *See Atlas v. Accredited Home Lenders Holding Co.,* 2008 WL 80949, at *10 (underwriting practices of mortgage originator "would be among the most important information looked to by investors"). Shareholders would reasonably consider the Company's financial performance in deciding whether to reelect the directors. Likewise, though Plaintiffs' reasoning is a bit more circuitous on this point, shareholders would be interested in knowing whether the directors would use deceptive methods to achieve the performance measures that were the benchmarks of the 2005 and 2006 compensation plans. Though it is more difficult to evaluate the Board's statements regarding the effectiveness of the director and executive compensation policies, the statements concerning the Company's extraordinary performance in a challenging environment were also material and misleading if, in fact, they failed to disclose the Company's true financial condition. Accordingly, Plaintiffs have adequately stated a § 14(a) and Rule 14a–9 claim for all Defendants except Dougherty and Snyder.

### E. Breach of Fiduciary Duty Under State Law

#### 1. Failure of Oversight

█ Claims 1 and 2 allege that Individual Defendants breached their fiduciary duties by failing to prevent the wrongdoing within Countrywide. A director is liable for "failure of oversight" type claims where he demonstrates a "lack of good

faith as evidenced by a sustained or systematic failure ... to exercise reasonable oversight," *In re Caremark Int'l Inc. Deriv. Litig.,* 698 A.2d 959, 971 (Del.Ch.1996), or an intentional failure "to act in the face of a known duty to act, demonstrating a conscious disregard for his duties," *Stone v. Ritter,* 911 A.2d 362, 369 (Del.2006) (citing *In re Walt Disney Co. Deriv. Litig.,* 906 A.2d 27 (Del.2006)). Thus, the standard for holding a director liable for a failure of monitoring is a "scienter"-based one. *Desimone,* 924 A.2d at 935. The finding of a strong inference of at least deliberate recklessness in Section II.A, *supra,* applies equally to the analysis of the failure of oversight claims. Because Plaintiffs have stated a claim under this theory, the Court denies Defendants' Motion to Dismiss for all Defendants except Dougherty and Snyder.

#### 2. Corporate Waste

The third claim charges Individual Defendants with causing "waste of corporate assets" by (1) awarding excessive compensation to senior executives; (2) conducting the share repurchase plan; and (3) incurring millions of dollars in legal liability and legal costs to defend Individual Defendants' unlawful actions. Compl. ¶¶ 502–505.

█ Like failure of oversight claims, corporate waste claims are subject to a stringent legal standard. Corporate waste "entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *Lewis v. Vogelstein,* 699 A.2d 327, 336 (Del.Ch.1997). "If ... there is *any substantial* consideration received by the corporation, and if there is a *good faith judgment* that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder

would conclude a post that the transaction was unreasonably risky." *Id.* (emphasis in original).

Here, the Complaint alleges little that properly casts Mozilo's compensation as "corporate waste." Plaintiffs marshal no facts or law that suggests that his compensation represents "a transfer of corporate assets that serves no corporate purpose; or for which no consideration at all is received." *Id.* While Mozilo's compensation may appear excessive, Delaware law observes that "[c]ourts are ill-fitted to attempt to weigh the 'adequacy' of consideration under the waste standard." *Id.*

■ Importantly—and this finding overlaps with the analysis of demand futility—Plaintiffs have not established that Mozilo's compensation was made in bad faith. Plaintiffs do not show that the directors on the Compensation Committee were themselves paid so much or were so beholden to Mozilo that the Court should question their independence. Plaintiffs offer a single *Wall Street Journal* article highlighting the top-of-the-line compensation received by Countrywide Board members, and otherwise unsupported argument that this compensation was so "astronomical" that it would be material to anyone's financial picture. Pls.' Opp'n to Defs.' Mots. to Dismiss at 18–19. The figures provided by Plaintiffs show that the other 8 directors receive total compensation between $358,966 to $538,824 for 2006. While these numbers may be substantial, the Court cannot conclude, without more, that they are "so lavish that a mechanical application of the [presumption of director independence] would be totally at variance with reality." *Grobow v. Perot*, 526 A.2d 914, 923 n. 12 (Del.Ch.1987) *aff'd*, 539 A.2d 180 (Del.1988). No differently, Plaintiffs' allegations that Mozilo dominated or controlled the Compensation Committee also require a series of unsupported inferences. Mozilo does not appear to have any au-

thority to nominate directors, nor is he a majority or controlling shareholder. Countrywide Reply Supp. Mot. to Dismiss at 22. More must be offered than the directors' singular role in relation to Mozilo's compensation to state a corporate waste claim on the basis of the directors' bad faith.

■ Second, the Court observes that Plaintiffs repeatedly mischaracterize the stock repurchase plan and insider selling as creating a scenario contemplated by *Aronson* (in the demand context) where Defendants "appear on both sides of a transaction" or "derive ... personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." Pls.' Opp'n to Defs.' Mots. To Dismiss at 10 (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del.2000) (en banc)). Defendants correctly respond that the Countrywide was purchasing shares on the open market where millions of shares are traded daily, and that the "repurchase" did not empower the directors' to sell any extra shares or sell shares at a price unavailable to other shareholders. Countrywide Reply Supp. Mot. to Dismiss at 4–5. This is not a scenario where the directors were simply dealing with themselves. However, the Court has previously concluded that a strong inference of scienter attaches to the allegations in this Complaint, and it follows that Plaintiffs have stated a claim that the repurchase is not subject to protection by the business judgment rule because, as the Court observed, it may have served to delay the eventual impairment caused by unsound business practices. Thus, Plaintiffs have stated a claim for corporate waste with respect to the stock repurchase program.

### F. Cal. Corp.Code § 25402

■ Section 25402 creates a cause of action against "any person who is an officer, director, or controlling person of an issuer ... to purchase or sell any security of the issuer in this state at a time when he knows material information about the issuer ... which would significantly affect the market price of that security and which is not generally available to the public...." Here, it requires that the Individual Defendants traded in Countrywide stock with actual knowledge of material, nonpublic information.

As explained previously, Plaintiffs have demonstrated, at a level sufficient to survive a motion to dismiss under the PSLRA, that the Individual Defendants acted with at least deliberate recklessness with respect to undisclosed, material information regarding the Company's underwriting practices. However, Plaintiffs have not pleaded facts that give rise to the inference the Defendants *actually* knew, even if it is probable based on Plaintiffs' facts that Defendants acted with at least deliberate recklessness. Thus, they have failed to state a claim under § 25402.

### G. Demand

■ Under Federal Rule of Civil Procedure 23.1, a plaintiff shareholder seeking to vindicate the interests of a corporation through a derivative suit must first establish standing to bring the suit, by demonstrating (1) that the plaintiff owned the corporation's stock at the time of the transaction of which the plaintiff complains and that the plaintiff retain ownership of the stock for the duration of the lawsuit, Fed.R.Civ.P. 23.1; *Lewis v. Chiles*, 719 F.2d 1044, 1047 (9th Cir.1983); and (2) that the plaintiff made pre-suit demand on the corporation's directors or pled with particularity the reasons why such a demand would have been futile. Fed.

R.Civ.P. 23.1; *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96, 102 n. 7, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991). This second requirement is vigorously contested by the parties.[38]

Here, where Plaintiffs have not made a demand on Countrywide's Board, they must adequately demonstrate that demand is futile to withstand Nominal Defendant Countrywide's motion to dismiss. This Court's inquiry into demand futility is governed by the law of Delaware, the state of Countrywide's incorporation. *See In re Silicon Graphics*, 183 F.3d at 989–90 (citing *Kamen*, 500 U.S. at 96, 111 S.Ct. 1711). On a motion to dismiss for failure to comply with the requirements of Rule 23.1 and Delaware law, a court limits its consideration of the facts to those particularly alleged in the complaint. *Aronson*, 473 A.2d at 813. Thus, conclusory "allegations of facts or law not supported by allegations of specific fact may not be taken as true." *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991).

■ Delaware law provides two different tests to evaluate demand futility. *See Rales v. Blasband*, 634 A.2d 927, 933–34 (Del.1993); *Aronson*, 473 A.2d at 812. When the alleged wrong constitutes a business decision by the board of directors, a court should employ the *Aronson* test, which evaluates whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent; or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. *Aronson*, 473 A.2d at 812. While the first inquiry focuses on the directors, the other concerns the substantive nature of the challenged transaction and the board's approval thereof. *Id.* at 814.

---

38. As noted in footnote 2, the stock ownership requirement is satisfied.

■ When the subject of the derivative suit does not constitute a business decision by the board—or when a plaintiff challenges board inaction—a court should employ the *Rales* test. *See Rales,* 634 A.2d at 934. The *Rales* test evaluates whether the particularized factual allegations create a reasonable doubt that, as of the time the complaint was filed, a majority of the board could have properly exercised its independent and disinterested business judgment in responding to a demand. *Rales,* 634 A.2d at 933–934.

■ A director is interested if he will be materially impacted, either to his benefit or detriment, by a decision of the board in a manner not shared by the corporation or the shareholders. *Seminaris v. Landa,* 662 A.2d 1350, 1354 (Del.Ch. 1995) (citing *Rales,* 634 A.2d at 934). The mere threat of personal liability is insufficient to render a director "interested"; but a "substantial likelihood" of liability does create a reasonable doubt as to the interestedness of the director. *See Rales,* 634 A.2d at 936. In the context of a business decision, a director is considered interested if he or she is on both sides of a transaction, that is, the director was engaged in self-dealing. *Aronson,* 473 A.2d at 812. A director is not considered independent if the board is either dominated by an officer or director who is the proponent of the challenged transaction, perhaps by a close personal or familial relationship or by force of will, or if the board is so under the director or officer's influence that its discretion is "sterilized." *See Rales,* 634 A.2d at 936. *See also Telxon Corp. v. Meyerson,* 802 A.2d 257, 264 (Del. 2002).

■ Demand futility analysis is conducted on a claim-by-claim basis. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,* 833 A.2d 961, 977 (Del.Ch.2003). *See also Bidzos,* 2003 WL 22284323 (evaluating demand futility for each claim individually). Here, the factual allegations and claims fall into three (largely overlapping) categories, and the parties dispute demand futility along those lines: Counts I–II allege that the Board grossly mismanaged the Company and abdicated their duties. Counts III alleges waste of corporate assets. Counts IV–IX assert the dissemination of false and misleading statements and insider trading. The Court proceeds by evaluating demand with respect to each set of claims.

### 1. Oversight Allegations

Because the first two claims allege that Individual Defendants failed to properly manage the Company in several ways that did not follow from a business decision of the entire Board, the Court applies the *Rales* test to determine whether demand is futile here.[39] As described in Section II.D, *supra,* the legal standard governing the *Caremark* claim here is a stringent one, essentially requiring that "the directors ... acted with a state of mind consistent with a conscious decision to breach their duty of care." *Desimone,* 924 A.2d at 936.

Of the nine directors, two, Mozilo and Sambol, are "inside directors" with significant management responsibilities. Plaintiffs contend that due to their positions, these inside directors are "admittedly" not independent for purposes of demand futility analysis. Defendants appear to agree. *See* Countrywide Mem. Supp. Mot. to Dis-

---

**39.** Contained within the first claim are some allegations that do relate to decisions by the Board. *See, e.g.,* Compl. ¶ 492f (alleging that directors took "steps to keep the price of Countrywide's stock artificially inflated by initiating a share repurchase program").

However, as the decisions are not challenged directly, and because the overwhelming majority of the first claim does not relate to specific business decisions, the Court finds that the *Rales* test is applicable.

miss at 5 (only seven of the nine directors are considered independent for purposes of Countrywide governance policies).[40] The view is consistent with a Countrywide filing with the SEC. *See* Defs.' Request for Judicial Notice to Dismiss All Derivative Claims, Exh. 13, at 11 (Countrywide proxy statement stating that Mozilo could not be deemed independent as a result of his management positions).[41] Accordingly, demand is futile for these claims if three of the remaining seven "outside" directors (Defendants Cunningham, Donato, Melone, Parry, Robertson, Russell, and Snyder) face a "substantial likelihood of liability."

The arguments here overlap with those made on the Motions to Dismiss. Briefly, Defendants argue that the changes in the Company's portfolio did not necessarily expose the Company to risk, because most of the risk associated with "nontraditional" loans was passed on to sophisticated institutional buyers. Countrywide Mem. Supp. Mot. to Dismiss at 9. In any event, Defendants contend that the Complaint "does not allege a single particularized fact suggesting that the Board understood anything other than that these loans were sound investments." *Id.* Plaintiff respond that "the Complaint alleges a series of wrongful acts ... which evidence a pattern of misconduct showing a wholesale abandonment or abdication of the Board's duties, including a lack of due care and oversight." Pls.' Opp'n to Defs.' Mots. To Dismiss at 12. In particular, they argue that (1) financial indications of Countrywide's problems would have been obvious if the Directors had been executing their fiduciary duties in good faith; and that (2) despite news of increased delinquencies in the market, "the Board did nothing to ensure that Countrywide remained in a position of credible lending—as Mozilo was openly boasting to the market," *id.* at 12. They further contend that problems with the loan loss reserves, hedging and management of risk resulted from the Directors' abdication of their duties.

### a. Analysis

■ While demand and the PSLRA provide distinct legal inquiries in assessing a Complaint, the discussion on the scienter requirement in Section II.A, *supra,* is pertinent here because it concludes that the Complaint establishes a strong inference of deliberate recklessness for several of the Individual Defendants. In its analysis of scienter, the Court determined that several of the Board's Committees were directly responsible for monitoring Countrywide's risk exposures and the financial performance of its loan portfolio, both of which implicate a fundamental part of the Company's business—the quality of the loans originated and adherence to underwriting standards. The Audit Committee, for example, composed of Defendants Melone, Parry, and Russell (and Cisneros for a time), was tasked with overseeing the exposure to risk and management of systems "to assess, monitor, and control such exposures," *Id.* ¶ 80. The Company's Finance Committee—composed of Defendants Donato, Melone, and Russell—was responsible for assessing and monitoring other aspects of market risk with respect to liquidity, financing, and mortgage loan sales. *Id.* ¶ 92. At the same time, the Court found credible the Complaint's confidential witness accounts, which suggest a widespread Company culture that encour-

---

**40.** Even if Defendants do not expressly concede this point by virtue of their roles in the day to day management of the Company, Defendants Mozilo and Sambol are far closer to the alleged wrongdoing than any of the outside directors for demand purposes.

**41.** While the 2006 filing does not assess Sambol's independence, his role as President and Chief Operating Officer raises the same issues as with Mozilo.

aged employees to push mortgages through without regard to underwriting standards. The Court found an inference that Defendants, charged with these duties, and presented with at least two major trends, or "red flags," that pointed to increased delinquency and nonperformance in the Company's riskiest loans and ultimately implicated the Company's underwriting practices, acted with scienter. Defendants on at least the Audit & Ethics Committee (Melone, Parry, and Russell) and the Finance Committee (Donato, as well as Melone and Russell) could not ignore the impact of departures from underwriting standards, especially given the public report issued by a coalition of banking regulators condemning low-documentation loans, *id.* ¶ 139, and the demise of competing lenders later in the Relevant Period.

For the same reasons that it found a strong inference of scienter, the Court finds that the Complaint pleads evidence of a "sustained or systematic failure of the board to exercise oversight," *Caremark,* 698 A.2d at 971, so as to create a substantial likelihood of liability for at least the members of those Committees.[42] It defies reason, given the entirety of the allegations, that these Committee members could be blind to widespread deviations from the underwriting policies and standards being committed by employees at all levels. At the same time, it does not appear that the Committees took corrective action. Though the Complaint leaves many details unpled, it provides enough of a factual basis for this Court to determine

that a majority of the directors are "interested" for demand purposes at this juncture: Mozilo, Sambol, Melone, Parry, Russell, and Donato. Accordingly, the Court concludes that demand is excused for Claims 1–2.

### 2. Waste Allegations and Insider Trading

The parties agree that *Aronson* provides the appropriate test for demand futility on the waste allegations because the claim challenges distinct decisions by the Board. *See Aronson,* 473 A.2d at 812. Accordingly, the Court must determine whether, with respect to these Board decisions, Plaintiff has demonstrated a reason to doubt that (1) a majority of the Board is disinterested or independent; or (2) the challenged acts were the product of the Board's valid exercise of business judgment.

As the Court observed in Section II.D, *supra,* the Complaint offers little as to the compensation-related allegations that compose the waste claim, and nothing that clearly illustrates that the Board members were so overpaid or beholden to Mozilo that questions arise as to their independence. Accordingly, the Court cannot excuse demand under *Aronson* with respect to Mozilo's compensation.

██ The same cannot be concluded with respect to the repurchase program. Because the Court determined that a strong inference of scienter attaches to several of the Individual Defendants, there is reason to doubt that the stock repur-

---

**42.** This is not a situation where Plaintiffs "rely on the directors' statutory duties" in order to overcome "deficiencies in the particularity of [the] allegations ... to allege that what might have happened in law must have happened in fact," *see In re Computer Sciences Deriv. Litig.,* No. CV 06–5356 MRP, 2007 WL 1321715 (C.D.Cal. Mar.26, 2007). The allegations here concern the Board's fail-

ure to regulate practices at the very core of Countrywide's business model, unlike *Computer Sciences,* which involved the issuance of backdated stock options, *id.* at *6; or *Guttman* or *Bidzos,* which concerned the board's failure to properly oversee specific accounting practices. *See Guttman,* 823 A.2d at 494; *Bidzos,* 2003 WL 22284323, at *2.

chase program, executed in late 2006, was the product of the Board's "valid exercise of business judgment." Therefore the Court finds that demand is futile with respect to the stock repurchase program.

Claims 5–9, which allege both insider trading and violations of the securities laws for the dissemination of false and misleading statements, are governed by the *Rales* test because they do not challenge a Board decision. Again the analyses of the demand issue overlap with the discussion of scienter and the other securities laws allegations, and for the same reasons, demand is excused as to Claims 5–9 because at least a majority of directors, at the time of filing suit, face a substantial likelihood of liability under the claims.

In sum, consistent with the conclusions reached in Sections II.A and II.D of this Order, the Court determines that demand would be futile for all of the claims except for those regarding Mozilo's compensation.

### III.

### CONCLUSION

Demand is excused as futile with respect to the claims for failure of oversight and insider trading. It is excused with respect to the claim for waste only as it pertains to the repurchase decision.

Defendants' Motions to Dismiss for failure to state a claim under Exchange Act § 10(b) and Rule 10b–5, Exchange Act § 20(a), § 20A, and § 14(a) and Rule 14a–9 are DENIED as to all Defendants except Dougherty and Snyder. The Motions to Dismiss as to those claims are GRANTED as to Dougherty and Snyder. Likewise, Defendants' Motions to Dismiss are

DENIED as to the state law claims for breach of fiduciary duty, with the exception of claims regarding Mozilo's compensation, as to the same Defendants. The Motions to Dismiss on those state law claims are GRANTED as to Dougherty and Snyder. Lastly, the Motions to Dismiss are GRANTED with respect to the claim under Cal. Corp.Code § 25402.

Plaintiffs are directed to file an amended Complaint, if any, within 20 days of the date of this Order.

IT IS SO ORDERED.